## FENTON *v.* UNITED STATES (No. 385).[1]

CORK FLOATS—MANUFACTURES OF CORK.

Small, oval-shaped pieces of cork tapering at one or both ends and with holes lengthwise through them, would seem on examination not to be, and they appear by the uncontradicted testimony not to be, either fishing floats or cork floats for use in fishing. They are not commercially known as fishing tackle or parts thereof, nor are they in fact, as it appears, used as such. They are manufactures of cork and dutiable as such under paragraph 429, tariff act of 1909.

### United States Court of Customs Appeals, April 24, 1911.

APPEAL from a decision of the Board of United States General Appraisers, Abstract 23431 (T. D. 30667).

[Reversed.]

*McLaughlin, Russell, Coe & Sprague (Edward P. Sharretts* of counsel) for appellant.
*D. Frank Lloyd,* Assistant Attorney General (*Charles E. McNabb* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise involved is so-called cork floats, was imported at the port of Cleveland in 1909, and was assessed for duty by the

---

[1] Reported in T. D. 31546 (20 Treas. Dec., 875).

collector at 45 per cent ad valorem under paragraph 165 of the tariff act of August 5, 1909, which reads as follows:

165. Fish hooks, fishing rods and reels, artificial flies, artificial baits, snelled hooks and all other fishing tackle or parts thereof, not specially provided for in this section, except fishing lines, fishing nets and seines, forty-five per centum ad valorem.

The appellant duly filed his protest, the material parts of which are as follows:

Notice of dissatisfaction is hereby given with, and protest is hereby made against, your ascertainment and liquidation of duties, and your decision assessing duty, on the entries below named. The reasons for objection are as follows:

Cork floats are manufactures of cork, or cork chief value.

Manufactures of cork, wholly or in chief value, are provided for by name in paragraph No. 429 at 30 per cent.

Their use is not necessarily confined to fishing tackle, but were this not true the words "not specially provided for" found in paragraph No. 165 eliminate cork floats therefrom.

Designation of an article by name free or dutiable must prevail over words of general description.

Paragraph 429 of the act of 1909 is as follows:

429. Cork bark cut into squares, cubes, or quarters, eight cents per pound; manufactured corks over three-fourths of an inch in diameter, measured at larger end, fifteen cents per pound; three-fourths of an inch and less in diameter, measured at larger end, twenty-five cents per pound; cork, artificial, or cork substitutes, manufactured from cork waste or granulated cork, and not otherwise provided for in this section, six cents per pound; manufactures, wholly or in chief value of cork, or of cork bark, or of artificial cork or cork substitutes, granulated or ground cork, not specially provided for in this section, thirty per centum ad valorem.

The Board of General Appraisers overruled the protest and we quote the pertinent parts of their decision:

The merchandise is invoiced as "manufactures of cork." The goods are in fact cork articles shaped, and specially adapted for use as floats. They were assessed for duty at the rate of 45 per cent ad valorem under the provisions of paragraph 165, tariff act of 1909, which reads: "* * * all other fishing tackle or parts thereof, not specially provided for * * *." It is claimed that the articles are dutiable * * * under paragraph 429 * * * as "manufactures of cork, not specially provided for." The only issue raised is whether the corks here in question are within the provision for "fishing tackle or parts thereof." It is urged that they must be further manipulated in order to convert them into floats, and as they are not finished cork floats they are not dutiable under the provision above noted. The corks approach nearly their finished condition, afford sufficient evidence as to their special adaptation for use as floats, and would, then, appear to us to be dutiable as "parts" of fishing tackle.

At the outset the United States contends that the protest does not claim that the articles are not fishing tackle or parts thereof, but on the contrary recognizes them as cork floats, thereby, it is said, basing the protest upon the ground that the provision "manufactures, wholly or in chief value of cork," under paragraph 429, is more specific than that for "fishing tackle or parts thereof" under paragraph 165, and therefore the United States claims that the only

issue is which paragraph is the more specific. Stated in another way, this claim is that under his protest the appellant has no right to contend, as he seeks in substance to do here, that the articles involved are not floats and thereby parts of fishing tackle within the meaning of paragraph 165, but that he has conceded them to be floats and is limited to the claim that paragraph 429 more specifically applies thereto than does paragraph 165.

The record does not show that the United States made this claim before the board.

We think this contention can not prevail. The first claim made in the protest is that cork floats are manufactures of cork or cork of chief value. The reference to the articles as "cork floats" is not significant. They may be such and still not be floats or fishing tackle or parts thereof. From the collector's letter submitting the protest it would seem that he had classified them as cork floats and the importer should have the right to adopt that designation in his protest, without precluding himself upon the merits. The protest clearly raises the issue that the merchandise is a manufacture of cork or cork of chief value.

Before considering the question involved we turn to the evidence. It appears that the United States called no witnesses and that two were introduced by the appellant. This case seems to involve protests by other importers and the first witness, Mr. Pflueger, was one of the number. He testified in substance that he was a manufacturer of fishing tackle and metal novelties; that he was a practical fisherman and a member of several fishing clubs and organizations; that he never saw an article like the official samples used either for fishing tackle or as a part of it; that they were turnings, manufactures of cork; that he did not manufacture the same; that he had been in the business of manufacturing fishing tackle and metal novelties for 30 years and had had experience covering the same time selling the products; that he had never sold such an article as the official samples in this case as fishing tackle; that he had never heard them referred to as such; that there was an article well known as fishing tackle which he designated as a fishing float, samples of which were introduced in evidence as illustrative exhibits and are before us; that he sold these as fishing floats all over the world; that they were used to regulate the depth of the bait from the surface of the water and also to indicate that the bait had been taken by a fish; that such a float comes under the paraphernalia of fishing tackle; that the official samples are not in themselves finished articles; that to make them into fishing floats they must receive the following treatment and manipulations: They must be kiln dried to exclude all moisture so that paint will adhere firmly to the surface; then sticks or quills are inserted and cemented into the holes in the center of the samples;

then they are put into a lathe and turned to the proper shape and tapered down to meet the stick on each end and finished up to make a graceful shape; then sandpapered; then tumbled in a rolling barrel in which is thrown a substance while they are rolling that is absorbed into the pores and makes a waterproof surface; then permitted to dry; then painted, usually in more than one color; and then after again drying receive a coat of waterproof varnish to make the finished article waterproof. He further testified that the official samples were used for no other purpose so far as he knew except to make fishing floats in the manner just set forth; that he had been importing them for 30 years; that the object he had in ordering the articles shaped as are the official samples was to make fishing floats therefrom; and that when imported they were not true to shape but had to be re-turned, reshaped.

The other witness testified that he was a dealer in and bought and sold all the different kinds of fishing tackle, buying from nearly every manufacturer of that product in this country, and that he bought and sold goods like the illustrative exhibits as fishing tackle; that they were staple goods; that he did not handle goods like the official samples, and that they "couldn't be adaptable for any fishing tackle that I know of."

The official samples which are before us are small, oval-shaped pieces of cork, tapering at one or both ends, each having a small hole passing through the center at right angles to the largest diameter. The appearance of the illustrative exhibits, also before us, indicates that they were produced substantially as indicated by the witness from articles similar to the official samples. We think this uncontradicted evidence requires a finding of fact that the official samples are not when imported either fishing floats or cork floats used in fishing. Are they fishing tackle or parts thereof? The evidence indicates that neither are they commercially known nor in fact used as such.

The words "all other fishing tackle or parts thereof" in the paragraph must be given their ordinary meaning unless limited by the context. The Century Dictionary defines fishing tackle as "An angler's outfit; angling gear; the hooks, lines, rods, and other implements of the art of fishing," and the statute apparently uses the words in like sense.

We think it is apparent that the term "all other fishing tackle" is a collective designation inserted for the purpose of including any fishing tackle not specifically enumerated, and that the words "parts thereof" are inserted as a precaution and refer to such completed articles as may be used by anglers, either alone or in connection with another article. A part of a fishing tackle may well mean a rod or a reel, a hook or a line, and these articles are also in themselves fishing

tackle and collectively so designated. But we do not think in its common, ordinary meaning the term "fishing tackle" includes a rod, reel, hook, or float that is not in finished condition ready for the angler's use, and the term "parts thereof" must refer to the completed article, whatever it may be, that is also ready for use either alone or in connection with other articles of the angler's outfit. When ready for use it is a part of the fisherman's tackle, his outfit, one of his implements; and if not in a condition to be used, of course he can not use it, and it is not fishing tackle or a part thereof.

· The official samples, under the evidence, are not ready for the angler's use, and to hold them to be a fishing tackle or part thereof we think would do violence to the ordinary meaning of the words. Such a holding would involve the further conclusion, which seems unwarranted, namely, that Congress intended that an unfinished article, composed of nothing but cork, should be classified under Schedule C of the tariff act, which in its general scope relates to metal and its manufactures.

But it is urged by the United States that these importations are not manufactures of cork because, it is said, that not having a distinctive name, character, or use different from that of cork, and not being capable of use in the form in which they are imported, they do not fall within the definition of manufactures as laid down by the Supreme Court, and we are referred to decisions of that court to support the contention.

It is many times concededly difficult to define what is a manufacture of a given article within the meaning of different paragraphs of tariff acts, and equally difficult to determine whether a given product is or is not a manufacture thereunder. There are many judicial pronouncements on these questions that at first reading do not seem consistent with each other, and we shall not now make an attempt to reconcile them.

It was said in substance in the case of Lawrence *v.* Allen (48 U. S., 785) that a manufacture in some instances and for some purposes may be one kind of process performed on an article in its natural state and in some another kind.

In the Tidewater Oil Co. *v.* United States (171 U. S., 216), referring to the subject of manufacture, the court said:

"Manufacture" is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture each one of which is complete in itself but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window

sashes, trimmings and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name, * * * the finished product of one manufacture thus becoming the material of the next in rank.

In United States v. Dudley (174 U. S., 670) the court refers with approval to the last-mentioned case and says:

> In other words, a new manufacture is usually accompanied by a change of name, but a change of name does not always indicate a new manufacture. Where a manufactured article, such as sawed lumber, is usable for a dozen different purposes, it does not ordinarily become a new manufacture until reduced to a condition where it is used for one thing only. So long as "dressed lumber" is in a condition for use in house and ship building purposes generally, it is still "dressed lumber"; but if its manufacture has so far advanced that it can only be used for a definite purpose, as sashes, blinds, moldings, spars, boxes, furniture, etc., it becomes a "manufacture of wood."

Assuming the foregoing decisions of the Supreme Court furnish an outline for a rule enabling us to determine what is a manufacture, it follows, we think, both upon reason and authority, that when merchandise, as in this instance cork bark in its crude state, has been subjected to manipulations which have reduced it to a form and shape so that it can only be used in the manufacture of floats, which is clearly a definite purpose, it has become a manufactured article, and is a manufacture of cork. It is no longer cork in its crude state, but has been so manipulated that it is the finished product of one manufacture and is ready for the next in rank, namely, the manufacture of floats. Whether it has taken on a new name is not essential; it is only adapted to one use, and the evidence leaves it perfectly clear that it has yet to be subjected to, and is now ready to undergo and receive, the different operations and combinations that are required to make it into floats.

If wood so far treated as to be usable only for making sashes, blinds, etc., is a manufacture of wood, we have no doubt that these official samples are by the application of the same principle and the same reasoning manufactures of cork.

The various cases cited by the United States to support its contention last mentioned, upon careful examination, do not seem to be at variance with this conclusion.

It is held that the merchandise involved in this case is a manufacture of cork and as such is dutiable under paragraph 429 of the tariff act of 1909.

The result is that the judgment of the Board of General Appraisers is *reversed.*

MONTGOMERY, Presiding Judge, and HUNT, SMITH, and DE VRIES, Judges, concur.