KONISHI KOTAKUDO CO. (INC.) *v.* UNITED STATES (No. 3214)[1]

United States Court of Customs and Patent Appeals, December 30, 1929

*Allan R. Brown* for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*Kenneth G. Osborn*, special attorney, of counsel), for the United States.

[Oral argument October 7, 1929, by Mr. Brown and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The importers made 35 entries of merchandise at the port of New York. This merchandise was, in each case, entered as cylinder glass, bent, not exceeding 150 square inches, and was claimed to be dutiable at 1¼ cents per pound under paragraph 219 and at 5 per centum ad valorem under paragraph 224, Tariff Act of 1922, with an alternative claim under paragraph 220 at 4 cents per square foot, or that rate plus 5 per centum ad valorem under said paragraph 224. In each case it was returned for duty as manufactures of glass, at 50 per centum ad valorem under paragraph 230 of said act.

The material portions of the paragraphs in question follow:

PAR. 219. Cylinder, crown, and sheet glass, by whatever process made, and for whatever purpose used, unpolished, not exceeding one hundred and fifty square inches, 1¼ cents per pound; * * *

PAR. 220. Cylinder, crown, and sheet glass, by whatever process made, polished, not exceeding three hundred and eighty-four square inches, 4 cents per square foot; * * *

T. D. 43798.

PAR. 224. * * * cylinder, crown, and sheet glass, * * * when bent, * * * shall be subject to a duty of 5 per centum ad valorem in addition to the rates otherwise chargeable thereon.

PAR. 230. * * * all glass or manufactures of glass or paste, or of which glass or paste is the component material of chief value, not specially provided for, 50 per centum ad valorem.

As shown by the testimony and samples, the articles imported consist of unpolished pieces of glass of many shapes and sizes. The shapes include "sharp cornered, rectangles, cut corner rectangles, tonneau" and "tulip shape, pansy, rococo shape, diamond and rectangular, convex ends, square, both cut corner and sharp corner, cushion shape and barrel shape," oval and round, and others not particularly described. They range in size from 14 millimeters in length by 10 millimeters in width to 35 millimeters in length by 24 millimeters in width. All these are bent into concavo-convex forms, have roughly cut edges, are about one-sixteenth of an inch thick, and are made of transparent lead glass. In their manufacture globes are blown from the glass materials and these globes are then split in half. By means of a steel wheel or diamond point the various pieces of glass are cut out of the half globes and by a tapping they are removed from the original material. None of them are fit for use when removed from the half globes, but must be trimmed, beveled, and fitted to the particular watch or other object with which they are to be used. In some cases they are flattened, or the form is somewhat changed by the application of heat and grinding before use.

The Customs Court overruled the protests and the importer has appealed. The same questions are involved in all the protests except in protest 238386–G/47568. In the matter of this last-mentioned protest, it appears from the appraiser's advisory report that the goods were erroneously classified under paragraph 238 of said act as unfinished watch glasses, and that they should have been classified under paragraph 230 of said act as manufactures of glass; no claim having been made in the protest under said paragraph, however, the collector adhered to his original classification and the Customs Court sustained him in such action.

The contention of fact made here by appellant is that the articles of importation are not manufactures of glass, but, rather, material not dedicated to any exclusive purpose, but such as can be used for several purposes. The legal contention is that as the articles may be used for more than one purpose they can not, under the authorities, be considered as manufactures of glass. In support of its contention, appellant cites and relies upon *Bache & Co.* v. *United States*, 11 Ct. Cust. Appls. 314, T. D. 39129; *Athenia S. & W. Co.* v. *United States*, 1 Ct. Cust. Appls. 494, T. D. 31528; *Rogers* v. *United States*, 14 Ct. Cust. Appls. 51, T. D. 41552; *A. H. Ringk & Co.* v. *United States*, 16 Ct. Cust. Appls. 132, T. D. 42769; and other cases.

The records in *United States* v. *Berger*, 13 Ct. Cust. Appls. 362, T. D. 41258, and *United States* v. *American Express Co.*, 13 Ct. Cust. Appls. 350, T. D. 41255, were incorporated into the record by agreement. These records disclose that the merchandise before the court at those times, and which was identical with some of the forms before us now, were known as blanks for watch crystals and were used exclusively for that purpose. In the record at bar it is shown that the imported goods are known in the trade as blanks and that certain types of them are used for the making of watch crystals, some for sides of lockets used to inclose small objects such as butterfly wings, and some for tops of stoppers for perfume atomizers. Counsel for the Government has made a computation in his brief which is not controverted by appellant, whereby it appears that 29 of the entries here represent an importation of 17,508 gross of the articles in about 18 months. It appears from the record that the major portion of these are used in making watch crystals. A salesman for importer, Samuel Perlman, testified that at times he sold quantities of 5 gross or more for the making of lockets to Franklin & Co., of North Attleboro, Mass. and that he had sold some to the DeVilbiss Co., of Toledo, Ohio, for atomizer purposes, perhaps 350 to 400 gross three times a year; that there were other atomizer concerns making the same kind of article; that the importer had about 250 to 300 customers; that Franklin & Co. purchased 25 gross in about six months. Aside from the records in the other cases hereinbefore referred to, this concluded the evidence in the case.

This court is committed to the doctrine that an imported article may be classified as a manufacture of anything only when it has been dedicated to some exclusive use. *United States* v. *American Thermo-Ware Co.*, 4 Ct. Cust. Appls. 21, T. D. 33218; *American Thermo-Ware Co.* v. *United States*, 6 Ct. Cust. Appls. 218, T. D. 35465; *United States* v. *Bache & Co.*, 7 Ct. Cust. Appls. 445, T. D. 37011; *Bache & Co.* v. *United States*, 11 Ct. Cust. Appls. 314, T. D. 39129; *United States* v. *Berger*, 13 Ct. Cust. Appls. 362, T. D. 41258. This exclusive use is not necessarily confined to any one article, but may cover "a particular kind or class of articles." *A. H. Ringk* v. *United States*, 16 Ct. Cust. Appls. 132, T. D. 42769. For instance, it need not be shown, in the case at bar, that the imported articles are advanced to the point where they are dedicated to the use of any one kind of watch crystals; if they can be used for watch crystals, generally, that is sufficient.

The only remaining question is whether one exclusive use has been shown by this record for the imported articles. The record is somewhat confusing in this respect and counsel have apparently proceeded in their arguments before us on the theory that more than one use has been shown for the articles of importation, the Government contending that the use for atomizer tops and locket sides is

fugitive, while the importer insists as strenuously that this is a substantial use. A close examination of the record and of the testimony of the witness, Perlman, discloses that some of these articles of importation were sold for watch crystals, some to makers of lockets, and some to makers of atomizer tops. He stated that the various articles of importation were known by certain trade numbers and so ordered; that in every case where this merchandise was ordered the person ordering it ordered by the specific trade number, specifying the exact size and shape required; for instance, on cross-examination, the witness stated:

Q. The merchandise here in litigation that is ordered on the specifications of your firm as to dimensions and shapes?—A. Yes.

Q. It is never ordered in any other way?—A. What do you mean by it is never ordered in any other way?

Q. When you buy from abroad you buy according to shape and specific dimensions, is that not correct?—A. Yes, I will say this, but that we will have certain standard numbers which designate shape and size.

Q. The number will mean a certain shape and a certain size?—A. That is right.

Q. And when you in turn sell the merchandise it is sold in accordance with certain specifications as to size and shape?—A. Yes.

Q. You testified on direct examination that certain of these crystals were sometimes sold by you to a house which manufactured lockets for mounting butterflies?—A. Yes.

Q. Of those sold were they ordered by dimensions and shape?—A. They send us rims—they might send two or three samples and ask us to send them crystals to fit those rims.

Q. The illustrative exhibit, does that illustrate the particular size and shape that you have supplied to this particular house?—A. Is this the one you are referring to (referring to illustrative Exhibit A)?

Q. Yes.—A. Yes; we supply that shape and size to them.

All the remaining testimony is to the same general effect. It will therefore be seen that the imported merchandise does not have several uses, but that each particular item has its own exclusive use. In other words, at the time it enters the commerce of this country, it is dedicated to a particular use and has therefore become, in every sense, a manufacture of glass.

This being true, it follows that the judgment of the Customs Court should be and it is hereby *affirmed.*

BLAND and LENROOT, Judges, concurring:

We concur in the result arrived at by the majority. We dissent from the reasons assigned for arriving at such conclusion—

First, because the court is not justified in concluding that the evidence shows that there was a single use (a single class of uses is not found) for the merchandise involved. The court below tried the case upon the theory that there was more than one use shown and affirmatively found that the evidence did show more than one use.

In this court the case was argued with unanimity of opinion that there was more than one use shown, the Government contending that the use other than for watch crystals was fugitive. Unless the evidence is clear, the finding of the court below, which was supported by the Government here, should not be reversed.

Second, because we do not approve of the exclusive-use rule reiterated by the majority.

We believe the merchandise at bar should be classified under paragraph 230 as "all glass or manufactures of glass," not because it has one exclusive use, but because it has been processed from the raw material to a point where it has a distinctive character, name, or use different from that possessed by the original material, and that having undergone such processing it is immaterial that some one finds more than one use for it.

We are of the opinion that the decision of this case is controlled by the case of *United States* v. *Schrenk & Co.*, 7 Ct. Cust. Appls. 451, T. D. 37013. The merchandise in that case consisted of plates of polished cylinder glass of two sizes, one 12 by 14 and the other 14 by 40 inches, each sheet consisting of two plates glued together with transparent glue, with a strip of adhesive substance placed around the edges to prevent dampness from getting between the plates. The testimony showed that it could be used for automobile windshields and that it could be used for making jewelry cases and railroad signal lamps. It had been classified as a manufacture of glass under paragraph 95, Tariff Act of 1913, at 30 per centum ad valorem. The court below held it dutiable under paragraph 86 as cylinder glass. This court reversed the court below and said of the sheets of glass there in question:

Indeed, they may well be said to constitute a manufacture or at least a partial manufacture thereof sufficient to remove them from classification as polished cylinder glass and the importers concede both sides must be measured to obtain the area for the purpose of assessing duty.

Then the court discussed the definition of a manufacture of an article as defined by the *Tidewater Oil* case, *infra*, and concluded:

As we view the issue here it is not necessary for the decision of this case to determine whether the processes applied to the polished cylinder glass sheets have or have not resulted in a completed manufacture thereof, because if sufficient to remove them from the scope of paragraph 86 and not of the character to bring them within paragraph 90 they naturally fall under the provisions of paragraph 95 for "all glass or manufactures of glass * * * or of which glass is the component material of chief value not specially provided for * * *."

That is, restated, if the merchandise has lost the character of polished cylinder glass under paragraph 86, it has concurrently lost the right of classification under that and paragraph 90, and, for the purposes of this case at least, falls, as assessed by the collector, under paragraph 95, whether it be within the provision for "all glass" or for "manufactures of glass" therein mentioned.

While we do not regard the same as controlling, because this is a sample or experimental importation and the record indicates that like merchandise has been little, if any, used in this country, it should be noted that the witness said, referring to the importation, "We call it triplex glass." If that is its name, it affords another reason for the conclusion that it is a manufacture of glass under paragraph 90.

While that opinion indicates that the court was of the impression that it was a manufacture of glass, it contented itself with letting the classification under paragraph 95 stand, that paragraph providing for both "all glass" and "manufactures of glass." It would have been sufficient to have arrived at the same conclusion in this case. However, our views are at such variance with the majority opinion as to what constitutes a manufacture of an article that we feel compelled to discuss the authorities somewhat at length.

The majority have felt bound to adhere to the decisions of this court which, in determining what is a manufacture of an article, adopted the rule that (if it was to be used in connection with a further manufacturing effort) it must have been processed from the raw material to a state where it had but one use.

An examination of the authorities will show that this court, in applying the doctrine of use and following the technical wording of other decisions without regard to the broader aspects of the same, have, in some instances, drifted into making what the majority now regard as a hard and fast single-use rule which, however, is not warranted either by the decisions from which such drifting began or from any logical viewpoint that may be taken of the intention of the legislature.

On the other hand, this court has, in many instances, held articles to be manufactures of a thing which, when manufactured, had several uses as material for making other articles, and this, we think, was in entire harmony with what Congress intended. It is not necessary to cite all such holdings; a few will be sufficient.

Among such holdings is *Chrystal* v. *United States*, 5 Ct. Cust. Appls. 489, T. D. 35148. In that case broken waste pieces of refuse glass were ground and powdered and were held to be manufactures of glass, although the uses thereof were declared to be for rubbing down wood, the manufacture of glass paper serving the same purpose as sandpaper, and in the manufacture of matches as a friction material in match heads and on the sides of match boxes. There the article had advanced from the raw material, glass, and had become a new article which had a new use (and uses) and was no longer suitable for any of the uses for which the raw material was used. This should be the test in the case at hand.

In *United States* v. *Richter*, 2 Ct. Cust. Appls. 167, T. D. 31680, and in all of the fur-cross cases in this court (and there were several of them) fur was cut and sewed into crosses and we held them to be

manufactures of fur although the fur crosses, as material, were used for many different manufacturing purposes. The fur, after it had been manufactured into crosses, was still material suitable for succeeding manufacturing efforts but had by manufacturing processes been advanced from the raw material to a point where it had a distinctive character, name, and *uses* different from that possessed by the original material.

This court began to drift in *Fenton* v. *United States*, 1 Ct. Cust. Appls. 529, T. D. 31546, when, in passing upon cork floats which were cork which had not been so far processed as to make the floats fishing tackle, but which were so far processed that they could be used for no other purpose than to make cork floats, it held them to be manufactures of cork. The court there referred to the rule in *Tidewater Oil Co.* v. *United States*, 171 U. S. 216, and *United States* v. *Dudley*, 174 U. S. 670, as affording an outline for a rule for determining what was a manufacture. In the *Fenton* case, *supra*, the court called attention to the difficulty of defining a manufacture and referred to the two last-cited cases and said:

Assuming the foregoing decisions of the Supreme Court furnish an outline for a rule enabling us to determine what is a manufacture, it follows, we think, both upon reason and authority, that when merchandise, as in this instance cork bark in its crude state, has been subjected to manipulations which have reduced it to a form and shape so that it can only be used in the manufacture of floats, which is clearly a definite purpose, it has become a manufactured article, and is a manufacture of cork.

Then the court turned the case by saying:

It (the unfinished cork float) is no longer cork in its crude state, but has been so manipulated that it is the finished product of one manufacture and is ready for the next in rank, namely, *the manufacture of floats*. Whether it has taken on a new name is not essential; *it is only adapted to one use, and the evidence leaves it perfectly clear that it has yet to be subjected to, and is now ready to undergo and receive, the different operations and combinations that are required to make it into floats.* [Italics ours.]

Continuing, the court, evidently having in mind the *Dudley* case, *supra*, said:

If wood so far treated as to be usable only for making *sashes, blinds, etc.*, is a manufacture of wood, we have no doubt that these official samples are by the application of the same principle and the same reasoning manufactures of cork. [Italics ours.]

We would here observe that while the court found there was but a single use for the cork in its advanced form it did not hold that a single use was necessary to make the cork there in question a manufacture of cork; that question was not before it.

In *United States* v. *American Thermo-Ware Co.*, 4 Ct. Cust. Appls. 21, T. D. 33218, the late Judge Smith, speaking for the court, cited

the *Fenton* case as well as the *Dudley* case and in passing upon unpolished, unground coquille glasses said:

However, assuming, without deciding, that such a practice is correct, we are of opinion that the evidence in T. D. 30266 does not sustain the Government's contention that the merchandise under consideration was so far advanced by processes of manufacture that it acquired a name, character, and use different from that of common window glass.

It will be noticed here that the court said "*and* use." (Italics ours.) This differs from the expression used in the *Tidewater Oil Co.* case, *supra*, and the *Dudley* case, *supra*, as well as in *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963. In the last-cited case, it should be noted, the expression is, "It has attained a distinctive name, character, *or* use, different from that originally possessed by the material or materials before being subjected to the manufacturing process." (Italics ours.) Further along in the *American Thermo-Ware* case, *supra*, Judge Smith said:

From this it would seem that the merchandise has not been so manipulated or processed as to remove it from the class of manufactures specially provided for as window glass, bent, much less to put it in the category of manufactures of glass not specially provided for. From the testimony in T. D. 30266 we conclude that window glass, bent, such as that imported, may be used for lanterns, carriage lamps and cameras, and possibly for many other purposes. These varied uses make it very evident that the merchandise under consideration has not been converted into any specific new article. Neither has it been so dealt with that it is limited to a definite, particular purpose, nor so processed that it is fitted to be used commercially *in the manufacture of one thing only*. The merchandise continues therefore to be window glass, bent—that is to say, material not yet advanced to the stage of a new manufacture. [Italics ours.]

Here, it will be seen, this court for the first time (as far as we have been able to find) says: "Used commercially in the manufacture of one thing only," and we submit that if this expression is to be taken literally it is out of harmony with the reasoning in the *Tidewater Oil* case and the *Dudley* case. It is also out of harmony with the later decision of this court in *United States* v. *Schrenk & Co.*, *supra*, which we have already discussed. The expressions of this court in certain cases subsequently decided and until the decision of *Ishimitsu* v. *United States*, *supra*, adopted the single-use phrasing of the *American Thermo-Ware* case, *supra*, and now the majority regard it as an inviolable rule.

In the *Ishimitsu* case, *supra*, however, we think the correct rule was announced, and this case was decided long after the decision of a number of the so-called single-use decisions. It follows:

The derivation from the Latin *manus*, hand, and *facio*, to make, of "manufacture" as a noun indicates that its original meaning was something made by hand, while as a verb it would mean the hand processing necessary to producing the thing. While this meaning has been enlarged, yet, there still remains the idea that to constitute a manufacture of a thing, or a thing manufactured, it must

appear that something has been produced so changed or advanced in condition from what it was before being subjected to the processing or treatment that whether of only one material or of more than one, it has attained *a distinctive name, character, or use,* different from that originally possessed by the material or materials before being subjected to the manufacturing process. [Italics ours except as to Latin terms.]

If we are to extricate ourselves from the illogical and incongruous position in which we find ourselves with reference to the rule under discussion, we must go back to the original cases (*Tidewater Oil Co.* v. *United States, supra,* and *United States* v. *Dudley, supra,* decided in 1888 and 1889, respectively, both written by Mr. Justice Brown) which were the basis of this court's early decisions.

In the *Tidewater Oil Co.* case the court said:

Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, floors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name.

No single-use rule can be intended by the above-quoted language.

In the *Dudley* case, *supra,* the following wording might be misleading and must be carefully studied:

In other words, a new manufacture is usually accompanied by a change of name, but a change of name does not always indicate a new manufacture. Where a manufactured article, such as sawed lumber, is usable for a dozen different purposes, it does not ordinarily become a new manufacture until reduced to a condition where it is used for one thing only. So long as "dressed lumber" is in a condition for use for house and ship building purposes generally, it is still "dressed lumber;" but if its manufacture has so far advanced that it can only be used for a definite purpose, as *sashes, blinds, mouldings, spars, boxes, furniture, etc.,* it becomes a "manufacture of wood." [Italics ours.]

The decision holds that if the lumber has been advanced to a point where it could be used only for a definite purpose, to wit, making sashes, blinds, moldings, spars, boxes, furniture, etc., it becomes a manufacture of wood. It distinguishes between lumber which may be used for all purposes and lumber which, by reason of its advancement, is limited to the construction of sashes, blinds, moldings, spars, boxes, and furniture. How can we glean from this wording the single-use rule? On the contrary, it is distinct and logical authority for the conclusion that where a thing has been advanced from its general material character to a position where it has new characteristics and a new name, or new uses which exclude

many of its original uses, it is a manufacture. See also *Worthington* v. *Robbins*, 139 U. S. 337.

The majority opinion, in our judgment, in again adopting the single-use rule, overlooks what Congress has meant in using this expression, "manufactures of," almost half a hundred times in each of practically all of the tariff acts in the history of the nation. Congress proposed to levy a different and, ordinarily, a higher rate of duty upon an article which had been manufactured than was levied upon the raw material used in such processes. In the case at bar the majority opinion puts the court in the anomalous position of holding continuously over a period of years that unfinished watch crystals, manufactured of the same material and by the same processes as the merchandise at bar, had been advanced sufficiently to warrant the imposition of the higher duty, and of now declaring that if it had been shown that someone had found a new use for the same old material, then, in the view of the court, such material had not been sufficiently processed to be a manufacture.

The court below, as one reason for its conclusion, cited and discussed *Nyman & Schultz* v. *United States*, 14 Ct. Cust. Appls. 432, T. D. 42060, where this court was called upon to determine whether strips of steel shaped into unfinished razor blades could properly be regarded as "unfinished razor blades."

The single-use or exclusive-use rule has frequently been applied by this court in determining when a thing is a "finished" article and also in determining when a thing is a "part" of an article. In making the application of this rule in these two last-referred-to instances, reasoning has been employed which may be somewhat analogous to that employed by this court in applying the single-use rule to the determination of the question as to what is a manufacture. That the rule properly applies in the first two instances and not in the third would seem too obvious to require extended argument, since the conclusion to be reached in the first two instances is entirely different from that to be reached in the last. In the first two instances use determines the question, and in the third the degree of processing is the determining factor. To be a part of an article or to be an unfinished article, the article when completed, of course, must be the particular article mentioned in the statute and not several articles— use controls. To be a manufacture of a thing, it must have been processed from the original material to where it has a new name, new characteristics, or a new use different from that which characterized the original component material—processing controls.

It seems to us that it would be absurd to hold that if these identical articles can be used for watch crystals only they are manufactures of glass, but if the same ones used for watch crystals can also be used in the making of lockets, serving exactly the same use in a locket that a

crystal does in a watch, then they would not be manufactures but would be cylinder glass. If the exclusive-use rule adhered to by the majority shall become the accepted rule of law, some day this court may be called upon to hold that a very highly processed article, worth many times as much as the material from which it was made, must be classified for duty at the rate which the material bears because, forsooth, the highly processed article can be used for two purposes of the same general character, and therefore is not a manufacture of the material, whereas the identical article, if used for only one purpose, would be held to be a manufacture and carry a much higher rate of duty. We submit that such could never have been the intention of Congress, and it is our duty to apply a rule of reason to the matter rather than to continue to apply a rule that produces absurd results.

If this court has erred in the past in this matter, we should not hesitate to correct the error, rather than wait for Congress to do so, especially where the public interest is injured by a continuation of the error.