(C. D. 291)

---

CHARLES B. CHRYSTAL CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 7, 1940)

*Lane & Wallace* (*Samuel Isenschmid* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Richard F. Weeks*. special attorney, and *Frank X. O'Donnell, Jr.*, junior attorney), for the defendant.
*Brooks & Brooks* (*Ernest F. A. Place* of counsel) appearing as *amici curiae.*

Before Brown, Tilson, and Kincheloe, Judges

Brown, Judge: This suit against the United States was brought at New York to recover certain customs duties claimed to have been illegally exacted upon an importation of what was described on the invoice and entry papers as powdered pumice or powdered pumice stone.

The collector of customs at the port of New York classified the merchandise as manufactured pumice stone under paragraph 206, Tariff Act of 1930, and assessed duty thereon at the rate of ¾ of a cent per pound.

The importer protested, claiming that the merchandise was neither wholly nor partly manufactured and was, therefore, dutiable at ⅒ of a cent per pound under paragraph 206, Tariff Act of 1930.

Paragraph 206 reads as follows, as to the pertinent parts:

Pumice stone, unmanufactured, valued at $15 or less per ton, one-tenth of 1 cent per pound; * * * wholly or partly manufactured, three-fourths of 1 cent per pound; * * *.

At the trial on February 7, 1939, Charles B. Chrystal, President and Treasurer of the importing company, was called as a witness in behalf of the plaintiff. Mr. Chrystal testified that he had been the managing executive of the corporation since 1920 or 1921; that he was the Charles B. Chrystal who testified in the case of *Charles B. Chrystal Co., Inc.* v. *United States,* T. D. 49571, 73 Treas. Dec. 825; that he was familiar with the pumice stone which was the subject of that decision; that he had seen the merchandise in the case at bar at the time of its importation and that it was the same as the pumice stone which was the subject of the decision in T. D. 49571; that the pumice stone in the case at bar is the same as that in the former case and came from the same locality, namely near the village of Canneto, on the Island of Lipari, one of the islands of Sicily; that the pumice stone in the instant case was valued at less than $15 per ton.

At this point the record in T. D. 49571 was, on motion of the plaintiff's attorney, incorporated without objection in the present record, as plaintiff's Exhibit A.

The witness further testified that he had been to Canneto, Lipari, in 1921, 1927, and 1937, and that the source of supply and the method of producing the pumice stone in question as described by him in the record in the former case was the same on all three of his visits.

The witness then produced a photograph, which he testified illustrated part of the locality at the Island of Lipari, showing the natural deposits of the pumice stone, or so-called sun-dried pumice stone, concerning which he had testified in the last case. The photograph was offered and admitted in evidence as plaintiff's Illustrative Exhibit B.

The witness further testified that the white portions of the photograph, somewhat resembling snow, illustrated the surface pumice stone and that the chutes which in the former case he had testified as the means of bringing down the surface pumice stone from the mountain sides were illustrated in the photograph by what seemed to be straight lines.

Under cross-examination the witness, Chrystal, identified on the photograph the openings of tunnels in the side of the mountain from which the witness testified lump pumice stone was taken, it not being within his knowledge that powdered pumice was obtained from the tunnels. Witness further testified that he or his company had been importing pumice stone for about 30 years under various tariff acts back to the Tariff Act of 1909, and that during that time imported pumice stone of the same character such differences being merely a matter of fineness of the powder or grain indicated by letters such as FF. or FFF.

The witness further testified that on each of the three times he had visited Lipari he had gone up the mountain through the surface pumice which lay like sand on the mountainside but looser than sand; that he sunk into it, at times up to his knees, but whether this loose formation went down 3 feet, 30 feet, or three hundred feet he did not know. It was also his recollection that this sand-like surface pumice was not intermixed with lump pumice.

The witness was asked to examine the contents of several small bags composing part of Collective Exhibit 1 in the incorporated case. Having made the examination the witness testified that he should say that it was sifted pumice and that in that condition it was shipped to the United States, packed in that way, and nothing was done to it other than sun drying and sieving to make the pumice ready for the customer, either before or after leaving Italy.

Mario Bolt, called as a witness in behalf of the plaintiff, testified that he had been engaged in the pumice stone business for about 15 years, either on his own account or in the employment of some one else; that he had been to Canneto in the Lipari Islands several times, the last time in 1923, and spent as long as a month there; that he was familiar with the pumice stone deposits which he stated lay like snow on the surface of the hill and were shoveled off the surface by workmen instructed to skim the powdered pumice so as to avoid getting the lumps of pumice stone which he testified lay in the subsurface 2 inches to several feet; that this powdered pumice is sent down in chutes to the seashore or to the top of sheds at the bottom of the mountain and there spread out to dry in the sun; that when dried it is screened through screens worked by hand and of various sized meshes for the purpose of removing any impurities and of grading according to fineness indicated by such notations as FF, FFF,

etc.; that aside from packing the pumice in bags the foregoing was all that was done to the pumice before exporting it.

Frank Ward, called as a witness in behalf of the defendant, testified that he was a United States examiner at the port of New York and that for the past 18 years he had been examining such or similar merchandise to that here involved; that both under the act of 1930 and of 1922 pumice stone in powdered form, such as here involved, had uniformly been classified as manufactured, although as far as he knew there was no way of telling whether the powdering was natural or artificial.

Elmer R. Murphey, called as a witness in behalf of the defendant, testified that he was chairman of the board of directors of James A. Rhodes & Co., who among other things imported pumice; that he had been connected with the company for 43 years and that the company imported pumice from the Lipari Islands; that he had been there a good many times, the last time being in 1927; that he had visited the mountains where the pumice was found and had seen it removed from the mountains and had followed the procedure that is taken with the pumice up to the time it is taken aboard ship. When asked to describe the procedure the witness went over much the same ground as the plaintiff's witness Bolt, the essential difference being that the witness Murphey testified that the naturally powdered pumice was always intermixed with lumps of pumice stone, the lumps being separated from the powdered part and either exported as lumps to be ground abroad or ground on the spot and put through the screening process, the resulting powdered pumice being indistinguishable from the naturally powdered pumice after being screened. A sample of lump-mixed pumice which was sent for by Rhodes & Co. was admitted in evidence as defendant's Illustrative Exhibit I.

There were also received in evidence a number of photographs (defendant's Illustrative Exhibits D to H, both inclusive) taken by the witness in 1927 showing various stages of the procedure as testified to by him. The witness, Murphey, also testified that there were rotary screens, as well as the ones already testified to, which produced the same results as far as grading the powdered pumice.

A moving picture offered in evidence by the defendant was objected to and, therefore, excluded. It was marked as defendant's Exhibit J for Identification.

Arthur J. Roth, called as a witness on behalf of the defendant, testified that he was the president of James H. Rhodes & Co.; that he had been in the pumice stone business for about 37 years; that he had been to the Lipari Islands about seven times, the last time being in 1937, and that the conditions were the same as in 1927; that if he had been asked the same questions he would have testified as had the former witness Elmer R. Murphey. The Government attorney

82

attempted to have the witness testify as to the various uses of pumice stone but the court ruled out most of the questions and all the witness was allowed to testify as to use was that the grades FF and FFF were used in the manufacture of soap.

The consensus of the above testimony is that, so far as the merchandise here involved is concerned, the procedure in handling the natural pumice from the mountainside to shipboard is as follows:

The natural pumice in powdered form (mixed or unmixed with lumps of pumice stone) is shoveled from the mountainside and sent down chutes to the seashore and there, either on the sand or on the roofs of sheds this naturally powdered pumice is dried in the sun and then run through a series of screens with various sized meshes and thus graded according to fineness. The pumice is then bagged and put aboard ship and in this condition imported into this country.

The sole issue here is whether shovelling the naturally powdered pumice from the mountainside, setting it out in the sun till dried, or running it through screens to grade the pumice, constitutes, separately or together, a process of manufacture.

A negative conclusion would seem to be inevitable. However, the Government attorney in his brief persistently argues that the testimony in the case at bar is to the effect that the screening is for the purpose of grading the powdered pumice, and that the various grades are necessary for merchandising in that form or for use in manufactured products, such as soap. He argues that separating into standard grades which have different prices removes the powdered pumice from its natural state as taken from the mountainside and is, therefore, a step in the process of manufacture. Attention is also called to the testimony that when lump pumice is ground the resulting powder must be screened for grading to become merchantable.

This reasoning is not very persuasive for, whereas the various grades after screening do not constitute the exact combination in which the pumice was taken from the mountainside, we think there is no doubt that, if for any reason after the grading by screening it had been determined to take it back on the mountain and scatter it there, no one would be able to distinguish the graded pumice from the natural pumice that lay on the mountain. But even if it could so be distinguished it would not from that fact alone prove that it had been manufactured in whole or in part.

It was not so many years ago that anthracite coal was almost universally used in this country for heating both in the home and in manufacturing plants. For the respective uses to which the coal was intended it was graded by screening into various sizes, such as egg, stove, furnace, etc., each being a standard grade and each having its own price, none being coal just as it was mined. Into what did this grading manufacture the coal?

In the case of *Gallagher & Ascher* v. *United States*, G. A. 7462, 24 Treas. Dec. 673, affirmed in 5 Ct. Cust. Appls. 59, T. D. 34095, cited in the Government brief, certain irregular lumps of pumice were separated as to size and quality and the sharp corners and edges smoothed by filing or rolling and in that condition imported to be afterward cut in half for instruments for wood polishing. These filed or rolled lumps were held by the appellate court to be partly manufactured pumice stone. In that case the rough natural lumps had been subjected to labor changing the original form in a way clearly devoting them to a definite final form of manufacture and use. The screening in the present case into definite grades goes no further than the separation in the *Gallagher & Ascher* case of the lumps for size and quality, which was not a form of manufacture and was not so held by the appellate court.

The case of *Fenton* v. *United States*, 1 Ct. Cust. Appls. 529, T. D. 31546, has no application here as the issue in that case was no issue between manufactured and unmanufactured but the issue was whether the so-called cork floats were dutiable as a manufacture of cork or as a manufacture under the designation of fishing tackle.

In the case of *Unkart, Travis & Co.* v. *United States*, G. A. 7366, 22 Treas. Dec. 828, there is an entirely different situation. Quoting from the decision:

It appears from the record that this straw is grown specially to be cut and prepared as indicated by the sample for drinking straws. The grain is not allowed to develop, as the straw is cut and sun dried.

There we have the dedication from the beginning of the material to the purpose of making drinking straws, and the act of cutting the growing stems at the proper stage was the first step in the process of manufacture which was completed by the sun drying.

There was the completed drinking straw which had been contemplated from the beginning and was properly dutiable under the provision for manufactures of straw. It is to be noted that the naturally developed stems at the time of reaping the grain were not gathered and sun-dried, which might have made that case comparable to the case at bar.

We have been unable to gather from the Government brief anything to alter the inevitable conclusion that shovelling loose pumice in naturally powdered form, whether mixed with lumps or not, then spreading the naturally powdered pumice to dry in the sun and grading it by screening does not constitute one or more processes of manufacture.

We therefore hereby sustain the claim in the protest for duty at one-tenth of a cent per pound under paragraph 206, Tariff Act of 1930, as pumice stone unmanufactured in whole or in part. Judgment will issue accordingly.