BEFORE THE SECOND DIVISION, JANUARY 23, 1953

**No. 57032.**— Greatrex, Ltd., and J. J. Gavin & Co., Inc. v. United States, protest 165626–K (New York).

LAWRENCE, Judge: Plaintiffs herein protest the classification by the collector of customs of certain imported articles, described on the commercial invoice accompanying the entry as "250 only smoothie irons," as household utensils within the provisions of paragraph 339 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 339) upon which duty was assessed at the rate of 40 per centum ad valorem. The specific provision of said paragraph reads—

PAR. 339. Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for: * * * composed wholly or in chief value of copper, brass, steel, or other base metal, not plated with platinum, gold, or silver, and not specially provided for, 40 per centum ad valorem; the foregoing rates shall apply to the foregoing articles whether or not containing electrical heating elements as constituent parts thereof.

It is contended that the articles should properly have been classified and assessed for duty as follows:

Paragraph 353, Tariff Act of 1930 (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802:

> \* \* ' articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:
>
> \*   \*   \*   \*   \*   \*   \*
>
> Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines)_____15% ad val.

or, alternatively:

Paragraph 397 of said act, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

> \*   \*   \*   \*   \*   \*   \*
>
> Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:
>
> \*   \*   \*   \*   \*   \*   \*
>
> Other (except slide fasteners and parts thereof)_____22½% ad val.

During the course of the trial of this issue, the following exhibits offered by plaintiffs were received in evidence herein:

Exhibit 1—Sample representative of the controverted merchandise, except for the plug attached to the end of the electric cord.

Illustrative exhibit 2—Leather case in which the imported article is inserted before being offered for sale.

Illustrative exhibit 3—Adapter plug which accompanies the iron at time of sale.

Illustrative exhibit 4—Copy of advertisement appearing in the "New Yorker" magazine of October 21, 1950, depicting the imported article together with leather case and adapter plug.

It was orally stipulated by counsel for the parties hereto that plaintiffs' exhibit 1 "is an article which has as an essential element, without which it will not operate, an electrical heating device which can only be activated by electricity" and that said exhibit "is composed in chief value of metal, not including platinum, gold or silver, and not plated with platinum, gold or silver or colored with gold lacquer."

Plaintiffs offered the testimony of two witnesses. None was tendered by the Government.

Daniel R. Branen, president of Greatrex, Ltd., for the last 3 years, and from 1935 to 1948, vice president, director, and general merchandise man of the Mark Cross Co., dealer in imported and domestic leather goods, testified that he supervises the selling for Greatrex, Ltd.; that he is in charge of importations of merchandise for his company; and that he is familiar with the article represented by plaintiffs' exhibit 1. He stated that at the time of importation the exhibit did not have the plug attached to the end of the electric cord. He testified that his company first started importing articles like exhibit 1 in the middle of 1948 and that during his prior employment with the Mark Cross Co. he had never handled such an iron. Before offering the article for sale, it is encased in a leather covering represented by plaintiffs' illustrative exhibit 2. In addition thereto, there is included an adapter plug (plaintiffs' illustrative exhibit 3) which fits into the plug attached to the electric cord and is necessary for use of the article in England, France, Germany, Switzerland, and most European countries where base receptacles are different from those employed in the United States.

Referring to plaintiffs' exhibit 1, Branen explained that with the use of a coin, the screw on the top of said exhibit could be turned to the numerals, "100–150" (which represents voltage), for use in this country on either A. C. or D. C. current, and would be turned to the figures, "200–250" for use outside of the United States. The witness stated that the iron weighs 1¼ pounds as compared to the 7- or 8-pound weight of a "household iron."

Identifying plaintiffs' illustrative exhibit 4 as an advertisement appearing in the "New Yorker" magazine, the witness testified that similar advertisements had appeared in "Vogue." He stated that when working with the Mark Cross concern, they had a domestic-made traveling iron about three times the size of the imported article but without the universal voltage provision, which meant that the iron could not be sold for use outside the United States. Prior to 1948, the witness had never seen a commodity similar in size and construction to exhibit 1 being sold in this country. The imported articles were sold to department stores, luggage stores, and gift shops, he stated, and in the department stores "they were sold entirely in the luggage department; where the travelling accessories were sold." In any other stores, the article was sold in the gift department, and he had never seen them in the household appliance department.

The five salesmen under Branen's supervision sold articles identical to exhibit 1 practically all over the United States. The witness personally has sold such merchandise in New York City. He testified that the iron used in his home is heavier—some are 5 or 6 pounds and some are even heavier—has a greater ironing surface, and is equipped with a thermostat. The thermostat controls the heat which by proper setting keeps the heat constant for the kind of material being pressed. Branen stated that there is no thermostat on exhibit 1.

As to the use of the article in controversy, the witness testified that he thought his wife while traveling used it "in ironing out some hosiery or something."

On cross-examination, Branen stated that the only iron similar to exhibit 1 which he had seen in actual use was the one used by his wife and that it was used during a week's stay at a hotel in Chicago and a 10 days' visit to Atlantic City. When asked if there was anything which would preclude its use in the home, the witness replied, "No, I just can't imagine any woman using it in the home after having your home iron," and added "It could be used any place."

Miss Eloise Davison testified as the second witness for plaintiffs. She stated that she is a consultant in household management and household equipment; that she has been in the field for a number of years; and that she has been registered as a consultant for the last 2 years. Prior thereto, she was a director of the New York Herald Tribune Home Institute, and she further testified that she had set up rural household electrical studies for the Tennessee Valley Authority and had headed and taught in the household equipment department at Iowa State College. She holds degrees from Ohio State University and from Iowa State College. While at Iowa State College, she "directed the graduate and undergraduate work in the equipment field and in the regulation of equipment to the better use of time and effort in the home," and had set up the first laboratory equipment. In explanation of this latter project, she stated:

Well, we worked with all sorts of household equipment. We had a rural electrical laboratory of eight homes out in the field, it was some of the first rural electrical work and we defined a problem and then we wrote it in to our laboratory and tried to work out an electrical solution for it.

In her consultant capacity, she had been an adviser for the National Electric Light Association (now called the Edison Electric Institute) and worked with and advised utility companies upon household use of electricity. She is also a consultant for the American Home Laundry Manufacturers Association which is composed of manufacturers of "washers and ironers and driers and everything

that relates to home laundry." She stated that she has written many articles on electrical appliances used in the home and that she is the author of the home economics section "for the Britannica." The witness further testified that her occupation requires her to do extensive traveling and that her work made her familiar with electric irons, their uses, and types of construction. She stated that she knows several electric irons which are referred to as "travelling irons." When asked to explain the types of iron which are generally used in the home, their characteristics, their structure, and the adaptations which they may or may not have, the witness replied—

Well, I think there are two general types for a long time. They were called 600 Watt irons—they were about 660; they were fairly heavy—five or six pounds, and recently, they have been made lighter, closer to a pound and a pound and a half with a thousand Watts, a thousand Watt unit.   *   *   *

*         *         *         *         *         *         *

The lower Wattage irons are less heavier·and I think that some of the recent— within the past, not too recent, five or six years experimental work indicates that a lighter iron with higher Wattage gives quicker and better results and since thermostatic control has been developed, we can use a higher Wattage iron which heats fast.   That is the reason for the 1000 Watt trend.

She stated that she did not think that the 660- or 1,000-watt irons were equipped with a snap switch but that they have a "rheostat" arrangement which is adjusted to the type of fabric to be ironed.   The witness testified that in her capacity as consultant in working with electrical appliances, she had never come across an electric iron identical or similar to plaintiffs' exhibit 1.   The "traveling irons" which she has seen were different in shape and she had never seen one with as low a wattage and with as small an ironing surface.   Compared to the 660- and 1,000-watt irons used in the home, it was her opinion that plaintiffs' exhibit 1 possessed one-third the ironing surface.   She stated that this is the first time she has seen an electric iron with low wattage and added that to use an iron of 75 watts, as compared to an iron of 660 or 1,000 watts, "would be a very slow process and I think the weight of evaporation of any moisture in any article that was dampened would be like ironing with a 75 Watt bulb.   I think you could use it for a little pressing, but I don't think you could use it for ironing."   With regard to 660- and 1,000-watt irons which are sold for use in homes in the United States, she has never seen any with a combination universal voltage.   The witness stated that she would never recommend an iron identical or similar to exhibit 1 for home use. She further stated that she would not give the controverted article a very warm recommendation but thought "some light things might be pressed with it."   She testified that based upon her experience, she would say that plaintiffs' exhibit 1 is not chiefly used in the home.

On cross-examination, on being asked whether she had ever seen plaintiffs' exhibit 1 in operation, she stated that she had used it herself; that she "tried to iron some different things" after she had been given the iron by plaintiffs' counsel for experimental purposes, and that was the only time she had even seen it in use.

Upon the record before us, it is clear that the plaintiffs have failed to overcome the presumption of correctness attaching to the collector's decision.   Paragraph 339, *supra*, within the provisions of which the controverted merchandise was classified, is predicated upon use (*United States* v. *The Friedlaender Co.*, 21 C. C. P. A. (Customs) 103, T. D. 46445), and it must be presumed that the collector found the imported irons to be chiefly used in the household.   Hence, the plaintiffs are charged with the burden of establishing by competent evidence that the articles in controversy are not chiefly so used.

Whereas the testimony of plaintiffs' witness Branen demonstrates his familiarity with the imported irons as articles of commerce, his knowledge of their use is

limited to his own family. Plaintiffs' witness Davison, who has had wide experience in home economics and the application of electricity to household use, could furnish little information as to the actual use of the imported articles for the reason that she had "never seen anything like it." Her testimony that she would not recommend these irons for household use, or that they would not be practicable for that use, is not sufficient to support a finding that in fact they were not so chiefly used. As to actual use, the only testimony offered by this witness was the experimental use to which she put one of said articles prior to trial.

After a full consideration of the record as made and the cases cited in the briefs of counsel for the parties hereto, we have no alternative but to hold that the presumption of correctness attaching to the collector's decision has not been overcome. The decision of the collector of customs is therefore affirmed. All claims of plaintiffs are overruled.

Judgment will be entered accordingly.

### DISSENTING OPINION

RAO, Judge: The majority of the court is of the opinion that the record in this case is lacking in conventional proof that the articles are not chiefly used in the household. They find affirmative evidence of use, elsewhere than in the household, on only three isolated occasions, and, therefore, conclude that plaintiffs have failed to overcome the presumption of correctness attaching to the collector's decision.

I do not agree that this alone is fatal to plaintiffs' claim under all the facts and circumstances of this case. There is other evidence in the record which I deem significant and material, and which, in my opinion, is sufficient to overcome the presumptively correct finding of the collector.

The presumption inherent in the collector's classification is not evidence. If the plaintiff introduces sufficient proof to make out a *prima facie* case, the presumption falls. It "can not be weighed against the evidence of the party challenging the correctness of his finding," *Morse Bros. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 553, T. D. 41432, and cases cited therein.

The exhibit itself, unquestionably a potent witness, together with the testimony describing it, shows affirmatively not only that it was designed for use as a traveling iron, but that it would be impractical to apply it to a household use. In the first place, it is equipped with an adapter for installation and use in foreign countries, i. e., while traveling. The iron is of a much smaller size, lighter weight, and lower voltage than those shown to be used by housewives for accomplishing their home laundry. It is sold in a leather traveling case, in the luggage or travel departments of department stores, and is advertised as a traveling iron.

Moreover, the evidence shows that the article is neither designed, suitable, nor adapted for use in home ironing, and would not be practical for such purpose. In this connection, the following testimony of the witness Davison, whose background and broad experience in the field of home electrical appliances have been set forth in the opinion of the majority, is entitled to considerable weight.

Q. Would you ever recommend that one purchase an iron identical or similar to Exhibit 1 for use in his or her home?— A. I think I can think of no circumstance in which I would recommend this for home use.

Q. Why do you say that?— A. Because for the same money you can get the— either a heavy or light one that will do the job and I think this is extremely tedious to use. I would never buy it or recommend it.

JUDGE LAWRENCE: Based upon your long experience and observation and knowledge of household appliances, is it your opinion that an iron like Exhibit 1 is adapted for household use?

THE WITNESS: No, I think it is not adapted for household use.

By Mr. Glad:

Q. In the light of your experience, for what purpose would you recommend the use of Exhibit 1?—A. I wouldn't give it a very warm recommendation; if I were going to use it at all, I would use it for I fly a great deal, I might press out a dress after flying. I think it is light and you might get a little result with it. I tried it on a coat that I had worn that I was wearing all day, but I think some light things might be pressed with it.

Q. In other words, just to press out the wrinkles caused by the packing of a suit or light material?—A. No, sir, that had been dampened.

Judge Lawrence: Miss Davison, have you expressed your opinion as to the utility of this iron based upon the size, its weight or its voltage or on all those things?

The Witness: Yes.

Judge Lawrence: Upon what do you base your opinion?

The Witness: On using the iron; on trying it; I used it a little; I used it a great deal—I haven't done an experimental job on it at all. I just wanted to know what I was talking about.

Judge Lawrence: What I mean is does that iron, Exhibit 1, have a character as to weight, and voltage and size adapted for practical household use?

The Witness: Not in my opinion.

*       *       *       *       *       *       *

Q. Based on your experience, would you say that Exhibit 1 is chiefly used in the home?

*       *       *       *       *       *       *

The Witness: No.

Clearly this witness was in a position to know what kinds of electrical irons are employed in the household. Her lifetime of study in home economics and electrical appliances equipped her with such knowledge. By the same token, having used the iron herself, although admittedly solely for experimental purposes, she was aware of the degree to which it could function. By comparison then, she was eminently qualified to assert that it had no practical utility for ordinary household use. And if it was not practical to use the iron in controversy for household use, it is fairly and reasonably inferable that it was not chiefly used for that purpose. .

Accordingly, I am of opinion that the presumption of correctness attaching to the collector's decision has been overcome. In view of the stipulation of the parties that plaintiffs' exhibit 1 "is an article which has as an essential element, without which it will not operate, an electrical heating device which can only be activated by electricity," and upon the authority of *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, I hold that the articles at bar are essentially electrical articles within the class specified in paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, dutiable at the rate of 15 per centum ad valorem. The claim in the protest to that effect should, therefore, be sustained.