(C.D. 2822)

INTERNATIONAL DISTRIBUTORS, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided   November 16, 1966)

*William E. Bush; John M. Page,* cocounsel; for the plaintiff.
*Barefoot Sanders,* Assistant Attorney General (*Andrew P. Vance* and *Avram Weisberger,* trial attorneys), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge:  The merchandise involved in this case consists of cork ball fishing floats of various diameters, imported from Portugal, and entered at the port of New Orleans on December 28, 1962.[1]

---

[1] This case was tried before me at New Orleans on October 20, 1965.  Plaintiff's brief was filed on March 8, 1966, and defendant's brief on July 26, 1966.  The case was resubmitted before the first division as presently constituted on May 5, 1966.

It was assessed with duty at 40½ per centum ad valorem under paragraph 1511 of the Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55649, as manufactures of cork, not specially provided for. It is claimed to be properly dutiable at 25 per centum ad valorem under paragraph 1535 of said tariff act, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865 and T.D. 53877, as fishing tackle or parts thereof, not specially provided for.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 1511, as modified, *supra:*

Manufactures wholly or in chief value of cork bark or cork, not specially provided for_____ 40½% ad val.

Paragraph 1535, as modified, *supra:*

Artificial baits, and all other fishing tackle and parts thereof (not including fish hooks), fly books, fly boxes, and fishing baskets or creels, finished or unfinished, not specially provided for, except fishing lines, fishing nets, and seines_____ 25% ad val.

It was stipulated at the trial that the merchandise was composed in chief value of cork. Four samples were received in evidence as plaintiff's collective exhibit 1. They are cork balls about ¾, 1, 1½, and 2 inches in diameter. (The invoice gives the sizes of the imported merchandise as ½, ¾, 1, 1¼, 1½, and 2 inches.) Each has a hole about three-sixteenths of an inch in diameter running through the center. There were also received in evidence four containers of such merchandise, as plaintiff's exhibits 2, 3, 4, and 5. Exhibit 2 has printed upon it:

INTERNATIONAL DISTRIBUTORS, INC.
MEMPHIS 2, TENN.
1 DOZEN–Cork Fishing Floats–1.½ inch
Made in Portugal

The other exhibits contain similar wording, except for the quantity and size of the floats. The official papers, which were received in evidence without being marked, reflect that the collector classified the merchandise as "manufactures, nspf, wholly or in chief value of cork or cork bark (cork ball fishing floats)."

Plaintiff's first witness was Ronald D. Garber, assistant legal director of International Distributors, Inc. He stated that the cork objects in litigation were offered for sale by the plaintiff in boxes such as exhibits 2–5.

Plaintiff's second witness was John P. Saussy, a resident of New Orleans, who testified that he has fished three or four times a month

in Mississippi and Louisiana waters for 20 years. Although he held a commercial fishing license in order to sell an exceptionally good catch, he fished basically for sport. He said he was a member of the Grand Island Tarpon Rodeo Association, which is a fishing club that puts on an annual rodeo at Grand Island; that he had been on the board of directors and was presently the entertainment chairman of the committee for the annual rodeo. He had attended the rodeo for 16 years. He was shown the four cork balls in collective exhibit 1 and stated that he would use them in line fishing; that the two smaller ones would be used in perch fishing, fresh water fishing, and that the larger ones would be associated with salt water fishing, and would be used with a larger line and a heavier lead. He would use such an object with a line running through it and a stick or small piece of wood inserted to fasten it to the line. In fresh water fishing, the line is tied to a cane pole and in salt water fishing a rod and a reel are used. A hook is at the terminal end of the line; 6 inches to a foot above it is a sinker which is wrapped around the line and clamped to it; and at various heights above the sinker is the cork, which has the effect of suspending the line at a given point. The purpose of the cork may be to allow the line to drift away from the boat without going straight to the bottom. As the fish strike, the cork goes underneath and "you pull back on your line sharply to sink the hook and land the fish."

The witness has personally used the smallest size for perch fishing or brim fishing and keeps it in his tackle box. He had not used the other three sizes in the spherical shape but had used the conical shaped ones. He would call all of the various paraphernalia he had discussed "fishing tackle." In his opinion, the line, hook, and the other various fishing implements including his tackle box constitute fishing tackle. To him the term "parts of fishing tackle" means any part of the whole.

Mr. Saussy testified that in 1957 he had spent a week on a commercial trawler engaged in shrimp fishing. He explained that the most common means of catching shrimp in Louisiana is to trawl, using a funnel-type net with a lead line across the bottom and a cork line across the top. The trawl is held open by two heavy boards and allowed to drag behind the boat along the bottom. The witness said he had observed the type of cork used; that it was not spherical but in the shape of a doughnut, and was larger than those involved herein. He stated that the corks used were 4½ to 5 inches in diameter and on larger commercial trawls would be as big as 10 inches in diameter. He had never seen spherical cork balls used in net fishing. In his experience, none of the corks here involved would be suitable for use on nets employed in shrimp fishing. The witness said he also uses

trawl nets during 6 months of the year to catch bait for his own fishing. The net is 14 feet across the top and has six or seven corks, which are considerably larger than those before the court. In his opinion, it would not be practical to use corks of the type involved herein on a trawl net because they would not be strong enough to hold the net. "You would need 30 of these corks. It just wouldn't work."

The fact issue for the court to resolve is whether the "cork ball fishing floats" are chiefly used as floats for nets and seines in the commercial fisheries, or with hooks and lines in single-line fishing for diversion or sport. Plaintiff was entitled to, and did, adopt the collector's determination that these articles were "cork ball fishing floats." *Fenton* v. *United States*, 1 Ct. Cust. Appls. 529, 533, T.D. 31546. Therefore, the possibility that they might be otherwise known or have any other use, is not before us. Such floats, if of a class or kind chiefly used to support the seines or nets of commercial fishermen, would not be "other fishing tackle" and would not be classed under that item of paragraph 1535. Semantically, "fishing tackle" has a more restricted meaning than tackle used by fishermen. In *Fenton, supra*, at page 532, the court approves a dictionary definition (from the Century) reading as follows: "An angler's outfit; angling gear; the hooks, lines, rods, and other implements of the art of fishing." An "angler" is one who fishes with an "angle," i.e. a hook (Webster's New International Dictionary, 1953 edition). Hence, a commercial seine fisherman is not an "angler," and we believe would never be so called, or if at all, humorously, in common speech. In enacting paragraph 1535, and its predecessor, paragraph 344, under the 1922 Act, the Congress had information before it that the words "fishing tackle" would not cover commercial fishing equipment. The Summary of Tariff Information (1920) page 225, interpreting the counterpart paragraph 136 of the 1913 Act, says "This includes the equipment of the man who fishes for diversion or on a limited scale. Fishing nets and seines for more extensive operations are provided for in paragraph 271." The Summary of Tariff Information (1929), schedule 3, page 738, under the heading "Fishing Tackle" says: "The fishing tackle covered by this paragraph is used principally by sportsmen. Fishing lines, nets, and seines used for more extensive operations are provided for in paragraphs 1004 and 1006 Practically the only items in this paragraph that are used in quantity by commercial fishermen are hooks * * *." This court and our appellate court have considered several times the classification of floats used in commercial, offshore, purse seine or gill net fisheries, but the possibility that they might be "fishing tackle" under paragraph 1535 has never even been put in issue. *Bryant & Heffernan, Inc., et al.* v. *United States*, 29 Cust. Ct. 399, Abstract 56936; *Seattle Marine & Fish-*

*ing Supply Co. et al.* v. *United States,* 38 Cust. Ct. 163, C.D. 1857, affirmed 45 CCPA 93, C.A.D. 679; *Robert E. Landweer & Co. et al.* v. *United States,* 47 Cust. Ct. 35, C.D. 2276.

Our appellate court's predecessor held in *Fenton, supra,* that floats apparently much like those at bar, and for like purposes, were not "fishing tackle," but this was due to their unfinished condition, and the law has since been amended to provide for such tackle "finished or unfinished." Moreover, nothing in the record now before us indicates that the floats before us are unfinished or unready for use by reason of not having undergone the operations described as necessary finishing in the *Fenton* case. A close reading of the *Fenton* opinion indicates that the floats there considered would have been held to be "fishing tackle" or parts thereof, but for objections not here applicable.

However, to sustain the protest we would have to find that the floats involved and those of the same class or kind were, at the time of importation, chiefly used in sport or recreation fishing with hook and line. Can we so find?

Since, as stated, plaintiff's adoption of the collector's findings eliminates possible uses of these cork spheres other than as fishing floats, we must take it as given, that is what they are. Mr. Saussy's uncontradicted testimony indicates they are too small for feasible use as supports for nets or seines. His experience with shrimp fishing and the use of a net to obtain bait for his own sport fishing, would seem sufficient to qualify him to say this. It is not a technical or scientific question requiring a high degree of qualification. His statement is supported by the articles themselves, as "potent witnesses." It is proper to consider their characteristics. *United States* v. *Colibri Lighters,* 47 CCPA 106, 109, C.A.D. 739. It is obvious that the flotation power of cork spheres 2 inches and under in diameter is minimal, especially after they have soaked up water as immersed they would. It is common knowledge that a cork float to support any substantial weight has to be larger. The conclusion results from considerations as to the relative density of cork and ocean or fresh water, which are nearly the same everywhere. Thus the fact that the witness has had no experience with most varieties of United States commercial fisheries and has personally fished only in Louisiana and Mississippi waters, would not make his testimony incompetent or deprive it of all probative value.

If there are but two possible uses, and one of these is shown to be unfeasible, the other must be the chief use.

Our appellate court and this court, following the principles our appellate court has established, have been properly chary when asked to draw conclusions as to uses nationwide from testimony as to uses in a limited area. If in this case, the witness had stopped with what

he knew of the use of the articles in litigation in Louisiana and Mississippi, clearly, because of the narrow geographical scope, it would have been insufficient to sustain a protest. When, however, he also testified that a certain use was not practical, that "it just wouldn't work," that cork floats of 2 inches diameter and under "were not strong enough to hold the net," he was not testifying as to local practices and preferences. There is no reason to surmise that in Penobscot Bay or Puget Sound a 2-inch float might be more effective than it is in the Gulf of Mexico. If a given combination of chemicals produced a certain reaction in the New Orleans Customs Laboratory, the court would expect the same reaction from the same combination at Savannah or Los Angeles. If you proved that a given chemical, applied to the skin, in Louisiana, caused it to break out in a terrible rash, you would not have to get witnesses from all over to prove the chemical was not chiefly used as a cosmetic. When, as here—the issues limited as they are—elimination of one use establishes that another must be the chief use, the chief use nationwide can be proven inferentially by proving that the alternative is not feasible. Thus in *A. N. Deringer, Inc.* v. *United States*, 48 Cust. Ct. 138, C.D. 2326, proof that in New England certain ladders of a peculiar design were chiefly used for fruit picking was held enough to establish that they were "agricultural implements" when supplemented by evidence showing that use for other purposes was dangerous and impractical. Acc.: *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T.D. 40668; *Empire Findings Co., Inc.* v. *United States*, 44 Cust. Ct. 21, C.D. 2148. Contra: *Greatrex, Ltd., et al.* v. *United States*, 30 Cust. Ct. 320, Abstract 57032, but note that it is the dissent therein, not the prevailing opinion, which is quoted and followed in the *Empire Findings Co.* case at page 29.

In *Mitsui & Co., Ltd.* v. *United States*, 56 Cust. Ct. 267, C.D. 2636, plaintiff tried to prove an imported wood product was "flooring" by showing that, if it were put on a wall, you could not sand it except with a hand sander. The difference between that case and this is that there, plaintiff to prove chief use arbitrarily selected one possible other use to refute, without warrant for excluding others, and then eliminated that selected other use by what was a mere drawback, not an impossibility. If the only use possible to be considered, other than on floors, was on walls, and if the merchandise had been impossible to apply to walls, the cases would be parallel. We said it would be different "if it really were proved to be impracticable to use these articles except on floors."

Since evidence of some probative force supplies the links of proof needed and not established by the collector's findings or by stipulation, we do not have to consider whether it is the weightiest that could be adduced. It casts the burden on the Government to refute it.

The presumption of correctness of the classification falls upon the making by plaintiff of a *prima facie* case, and it has no further evidential value. *Morse Bros. (Inc.)* v. *United States*, 13 Ct. Cust Appls. 553, T.D. 41432.

Thus we find that, there being no issue as to the articles being fishing floats, and it being impracticable to use them in net and seine fishing, they are chiefly used in hook and line fishing. As a matter of law, floats so chiefly used are parts of fishing tackle and are dutiable as such under paragraph 1535.

The protest is sustained and judgment will be rendered for the plaintiff.