(C.D. 4084)

MANTON CORK CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 7, 1970)

*Siegel, Mandell & Davidson* (*Joseph S. Kaplan* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Herbert P. Larsen* and
*James Caffentzis*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The legal question presented in this case pertains to
the proper classification, for customs duty purposes, of natural cork

balls 1½ inches in diameter with a center bore of ³⁄₁₆ inch. They were assessed for duty at the rate of 36 per centum ad valorem under item 220.50 of the Tariff Schedules of the United States as "[a]rticles not specially provided for, of cork". By a timely protest duly filed, plaintiff claims that they are properly dutiable under item 731.60 of the Tariff Schedules of the United States, at the rate of 25 per centum ad valorem, as "[e]quipment designed for sport fishing, fishing tackle, and parts of such equipment and tackle, all the foregoing not specially provided for".

For purposes of convenience the pertinent provisions of the tariff schedules may be set forth as follows:

Classified under:

"220.50    Articles not specially provided for, of cork_    36% ad val."

Claimed under:

"731.60    Equipment designed for sport fishing, fishing tackle, and parts of such equipment and tackle, all the foregoing not specially provided for_____    25% ad val."

As may be gleaned from the foregoing, the question presented is whether the natural cork balls, the subject of this case, are to be classified, for customs duty purposes, as fishing tackle or parts of fishing tackle, rather than articles not specially provided for, of cork.

In addition to the official papers and a pre-trial memorandum, the record in this case consists of the testimony of three witnesses for the plaintiff, two for the defendant, and three exhibits introduced by the plaintiff. The record also includes the record in the case of *International Distributors, Inc.* v. *United States*, 57 Cust. Ct. 369, C.D. 2822 (1966), and a stipulation entered into by the parties and approved by the court. Among other things, by the stipulation the parties have agreed that the merchandise in the case at bar is "the same in all material respects to that considered in *International Distributors, Inc.* v. *United States*, C.D. 2822, and therein held to be dutiable under the provisions of Paragraph 1535, as modified, as fishing tackle or parts thereof." The parties have also stipulated that it is plaintiff's sole claim that the merchandise in issue is properly dutiable under item 731.60 of the tariff schedules as equipment designed for sport fishing, fishing tackle, and parts of such equipment and tackle, not specially provided for, at 25 per centum ad valorem.

This protest was previously submitted to the court for decision upon a stipulation of the parties that the merchandise in question was the same in all material respects to the merchandise in the *International Distributors, Inc.* case, which held that the merchandise was fishing

tackle or parts thereof, and was therefore properly classified under paragraph 1535 of the Tariff Act of 1930, the predecessor provision to item 731.60 of the Tariff Schedules of the United States.

Based upon the stipulation as to the similarity of the merchandise, on July 10, 1967, the court entered a judgment sustaining the protest. Thereafter, the defendant moved for an order vacating the judgment on the ground that the stipulation had been inadvertent. The inadvertence stemmed from the fact that, at the time of the submission of the stipulation, the defendant had issued a notice limiting the *International Distributors, Inc.* decision. This limitation was based upon defendant's belief that, at a retrial, evidence would be available to establish uses for the merchandise in question other than in sport fishing. Specifically, defendant's motion to vacate referred to T.D. 67–106 (1 Customs Bulletin 216, 217) which, insofar as pertinent, reads as follows:

"The Bureau believes that at a retrial of this issue evidence can be presented to establish that there is a wide variety of uses for these cork balls and that these multi-purpose articles have not been associated with that one use as fishing floats so extensively as to acquire the status of parts of fishing tackle."

T.D. 67–106 therefore concluded: "The principle of C.D. 2822 [the *International Distributors, Inc.* case] is limited to the merchandise the subject of that case."

In the *International Distributors, Inc.* case, in the words of the court, "[p]laintiff was entitled to, and did, adopt the collector's determination that [the] articles were 'cork ball fishing floats'." 57 Cust. Ct. at 372. The court distinguished between floats, used to support the seines or nets of commercial fishermen, and those used by anglers, i.e., sportsmen who fish for diversion or on a limited scale. A commercial fisherman, it was pointed out, is not an "angler", and the words "fishing tackle" in paragraph 1535 of the tariff act would not cover or include commercial fishing equipment. The court consequently stated that the issue presented was "whether the 'cork ball fishing floats' [were] chiefly used as floats for nets and seines in the commercial fisheries, or with hooks and lines in single-line fishing for diversion or sport." *Ibid.*

The court, in the *International Distributors, Inc.* case, adverted to the case of *Fenton* v. *United States*, 1 Ct. Cust. Appls. 529, T.D. 31546 (1911), and stated:

"Our appellate court's predecessor held in *Fenton, supra,* that floats apparently much like those at bar, and for like purposes, were not 'fishing tackle,' but this was due to their unfinished condition, and the law has since been amended to provide for such tackle 'finished or unfinished.' Moreover, nothing in the

record now before us indicates that the floats before us are unfinished or unready for use by reason of not having undergone the operations described as necessary finishing in the *Fenton* case. A close reading of the *Fenton* opinion indicates that the floats there considered would have been held to be 'fishing tackle' or parts thereof, but for objections not here applicable." 57 Cust. Ct. at 373.

Since in the *International Distributors, Inc.* case, the plaintiff's adoption of the collector's findings eliminated possible uses of the cork balls other than as fishing floats, the question there presented was whether they were "chiefly used in sport or recreational fishing * * *." *Ibid.* Since the uncontradicted testimonial evidence there, as supported by the articles themselves, showed that they were too small to be used as supports for commercial seines or nets, the court found as a matter of fact that they were "chiefly used in hook and line fishing." In sustaining the protest, the court held that, as a matter of law, the "floats so chiefly used [were] parts of fishing tackle", and were therefore dutiable as such under paragraph 1535.

At the outset the court should like to dispose of defendant's contention that the *Fenton* case established a common meaning for the words "fishing tackle" which excludes the imported merchandise in the case at bar. Referring to the testimony of Mr. Jerome Manton, one of plaintiff's witnesses, that "certain wooden pegs had to be added to the cork balls before they could be used for fishing", defendant, in its brief, asserts that "[i]t is only when the pegs were added that the article was in a condition to be used and became a part of the fisherman's tackle." (Defendant's brief, p. 6) The reference, as made, is somewhat misleading. Mr. Manton, the vice president of the plaintiff corporation, in cross-examination, was asked if the merchandise was imported "exactly as shown in Plaintiff's Exhibit 2." The witness replied: "Yes, it is imported as shown." After responding that the merchandise was imported "in the package", referring to plaintiff's exhibit 2 which consisted of four cork balls with bore holes and five pegs, packaged in a transparent plastic bag closed with a cardboard header, the following examination ensued:

"Q. I note that the package contains not merely cork balls, but another product. Could you describe that product for us?— A. That is a tapered plastic peg, used to affix the line inside the hole. In other words, they take the ball and they place the line, the fishing line right around, alongside the hole, and use the peg to secure the line inside the ball. In that way, they don't have to disassemble their tackle to put the ball on the line. They can affix the ball anywhere along the line they wish by just putting the line alongside the hole and pushing the peg in.

"Q. And Plaintiff's Exhibit 2 is sold by you exactly as we see it here in court?—A. Yes, sir."

An examination of the plastic exhibit reveals that the cardboard header, in addition to the legend "Made in Portugal", and the name and address of the plaintiff, states:

> "4 Day & Night Cork Floats
> Fire Orange Day Float
> Glittering Silver Night Float
> Brilliant All-Purpose Yellow Float"

The header does not mention the five red pegs described in Mr. Manton's testimony nor the fourth cork ball which is unpainted.

There is nothing in the *Fenton* case that would justify a finding that the cork balls at bar are "unfinished" and for that reason do not qualify as "fishing tackle". Defendant nevertheless quotes the following paragraph from the *Fenton* case:

> "* * * we do not think in its common, ordinary meaning the term 'fishing tackle' includes a rod, reel, hook, or float that is not in finished condition ready for the angler's use, and the term 'parts thereof' must refer to the completed article, whatever it may be, that is also ready for use either alone or in connection with other articles of the angler's outfit. When ready for use it is a part of the fishermen's tackle, his outfit, one of his implements; *and if not in a condition to be used, of course he can not use it, and it is not fishing tackle or a part thereof.*" [Emphasis in defendant's brief, p. 6] 1 Ct. Cust. Appls. at 533.

The quoted statement from the *Fenton* case must be read in the light of the evidence in that case which indicated that the official samples therein "[were] not in themselves finished articles". According to the testimony of one witness:

> "* * * to make them into fishing floats they must receive the following treatment and manipulations: They must be kiln dried to exclude all moisture so that paint will adhere firmly to the surface; then sticks or quills are inserted and cemented into the holes in the center of the samples; then they are put into a lathe and turned to the proper shape and tapered down to meet the stick on each end and finished up to make a graceful shape; then sandpapered; then tumbled in a rolling barrel in which is thrown a substance while they are rolling that is absorbed into the pores and makes a waterproof surface; then permitted to dry; then painted, usually in more than one color; and then after again drying receive a coat of waterproof varnish to make the finished article waterproof." 1 Ct. Cust. Appls. at 531–532.

Surely any statements of the court in the *Fenton* case, based upon the evidence of the merchandise in that case, could have but little relevance to the case at bar where the cork balls, as imported, are perfectly round and smooth, and some, as indicated by plaintiff's exhibit 2, are painted of various colors.

By a separate point heading in its brief, the defendant argues that "the merchandise, as imported, is a mere material." No one would dispute the fundamental principle of customs law that the classification of an article, for customs purposes, must be based upon its condition at the time of importation. See *United States* v. *Citroen*, 223 U. S. 407, 414–415, 32 S.Ct. 259 (1912). For this principle defendant cites the case of *Charles T. Smith, Inc.* v. *United States*, 11 Cust. Ct. 39, C.D. 789 (1943). Many other cases can be cited. The applicability of this principle, however, cannot properly be regarded as an issue in this case. It cannot be seriously alleged that more had to be done to the cork balls by the manufacturer or importer to make them suitable for use. Although the defendant may, with perfect justification, question the alleged use or uses to which they may be put, the cork balls are undoubtedly a finished product. It is reasonable to contend that the cork balls "can be used for many purposes". The assertion, however, that "the merchandise, as imported, is a mere material", finds no justification in the record, and is without merit. The cases cited by defendant on this point have no application to the case at bar, and do not warrant further treatment. *Tide Water Oil Company* v. *United States*, 171 U.S. 210, 43 L. Ed. 139 (1898) ; *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938).

In an attempt to show that the imported cork balls "can be used for many purposes", defendant called two witnesses. The first was a manufacturer of gaskets who testified that "we accumulated a large variety of cork sheets in thicknesses while making gaskets, and then we decided to sell these different thicknesses of cork sheet." He indicated that although he sold cork sheets mainly for the use of gaskets, he also sold cork for other purposes such as bulletin boards, lining walls, decorative purposes and covering cracks. Although he stated that he did not sell products similar to plaintiff's exhibit 2, he did sell cork balls that he purchased from the plaintiff corporation. He has sold these cork balls at retail "to various people", including some to the Marlin Belt & Manufacturing Company, and Maison des Fleurs, but could not testify with any degree of certainty as to the use to which they were put.

Defendant's second witness was the import manager of the Walbead Company. The business of Walbead Company, according to the witness, is to "sponsor faddist ideas; we put out booklets, etc., to sponsor a fad which comes up every year." He elaborated: "Beaded curtains, jewelry, pompoms, buckles, anything that we feel that is the thing that will hit that year." Although he did not import the painted cork balls, he has imported "all types of cork balls." In response to a question in direct examination, as to the use made of these cork balls,

he replied: "We put out pamphlets for the idea we are sponsoring that year using cork balls, such as when we put out the beaded curtains, we add material to the package, or, if we sell them for decorations, Christmas balls, etc.; we sell sequence [sic] pins, etc., to put into the cork balls." He stated that he sold the cork balls to "[v]ariety stores, hobby shops, jewelry trade, general stores, I suppose." This witness testified that he has found many uses for the cork balls, limited only by the imagination of the user.

Each of the three witnesses who testified for the plaintiff represented a major importer of cork balls who had imported them in the millions. Each testified that the cork balls are predominantly used for fishing and are sold by retail merchants in the sport fishing trade. The vice president of the plaintiff, in response to the question how he became familiar with the uses of the cork balls, stated:

> "Being responsible for the importations of my firm, and to some degree sales over the last eleven years, I know for a fact that the larger use that I have come across has been for sport, the sport of fishing. These floats are used by the fishermen, attached to their line, used as a bobber."

When asked how he "got to know that", he replied:

> "I have done extensive traveling as well, visiting jobbers and wholesalers to the fishing trade, and basically, through these various business trips I have become familiar with the way these balls were used, and by whom."

When asked if he could give a "percentage figure", as to the usage of the cork balls, he candidly stated that of the over a million balls that his company imports yearly, he would "judge that under a hundred thousand are sold for other purposes."

Plaintiff's second witness was vice president and general manager of Cork Products Company that handles cork balls such as those in issue. As general manager he is responsible for purchasing, sales and administration for his company. His company is the third or fourth largest and, in his opinion, the plaintiff corporation was the largest. His company handles "from the range of half to three-quarters of a million cork balls in this range a year." He also knew the uses to which they were put by his customers. When asked what these uses were, he replied:

> "The uses include sports fishing, a certain amount of decorative items used on clothing, hobby craft, a few miscellaneous nondescript uses."

His response to the question whether any one use is predominant was equally clear:

> "The sports fishing use for us would take somewhere between 90 to 95 percent of our total imports."

The witness has occupied his present position for three and one-half years, and during that time the percentage figures that he gave have been a "consistent usage".

Plaintiff's third witness was the president of the American Star Cork Company for the past fifteen years but had been associated with the firm since 1919. He did "everything" for the company including buying and selling. His company handles all types of cork products including those represented by plaintiff's exhibits. He knew that his firm sold that merchandise to fishing jobbers and distributors who sold to "fishing tackle stores." For the past five years his company has sold cork balls only to jobbers and distributors who sold to fishing tackle stores. The witness testified that the American Star Cork Company would import about a million cork balls a year and is "one of the leading companies, maybe second or third", but also indicated that the plaintiff corporation "[does] a larger volume".

From the foregoing clear, consistent and uncontradicted testimony, the court must find that the cork balls in issue, by a factor in excess of ninety percent, were and are sold to fishing jobbers and distributors for the sport of fishing. All of plaintiff's witnesses spoke with candor and conviction. At least two had wide and extensive experience in the field and their testimony is entitled to great weight.

Many cases can be cited to illustrate that the testimony of such witnesses, when clear and uncontradicted, is of great probative value. See *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (1966) ; *A. Ponnock & Sons* v. *United States*, 45 Cust. Ct. 347, Abs. 64803 (1960) ; *United States* v. *F. W. Woolworth Co.*, 23 CCPA 98, T.D. 47765 (1935). See also *United States* v. *The Baltimore & Ohio R.R. Co.*, 47 CCPA 1, 5–6, C.A.D. 719 (1959), wherein the testimony of importers and merchants of certain cups and saucers, on the question of their use by their customers, was considered to be of "great probative value" in establishing chief use. In *The Baltimore & Ohio R.R. Co.* case the Court of Customs and Patent Appeals restated the holding of its predecessor court in *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, 124, T.D. 31120 (1910), and ascribed to such witnesses "every incentive to know the particular uses to which their wares are appropriated."

Although it is true that some of the evidence introduced by the defendant shows uses for cork balls other than as floats for sport fishing, this fact is not disputed by the plaintiff. Indeed, the more reliable and definite testimony on the quantity or extent of such "other uses" was submitted by the witnesses for the plaintiff. Based upon the overwhelming weight of the evidence the court finds that the cork balls of the size and nature of those in issue are cheifly used as floats in sport

fishing. The testimony leaves no doubt that such use exceeded all other uses. See *General Interpretative Rule* 10(e) (i).

A case that refers to "exceptional or incidental" uses is *Richardson Co.* v. *United States*, 8 Ct. Cust. Appls. 179, 181, T.D. 37289 (1917), in which carburetors, designed and constructed as parts of certain farm tractors, were held to have been entitled to free entry as parts of agricultural implements. In that case the court had occasion to say that "[o]f course, there are exceptional uses of these as of all implements, but exceptional or incidental use has never been held to control classification." As to "other possible uses" of imported merchandise, see also *American Astral Corporation* v. *United States*, 62 Cust. Ct. 563, C.D. 3827, 300 F. Supp. 658 (1969).

Also in point on the question of chief use is the case of *United States* v. *Lyon & Healy*, 4 Ct. Cust. Appls. 438, 442, T.D. 33873 (1913), wherein the Court of Customs Appeals, with reference to the Supreme Court case of *Magone* v. *Wiederer*, 159 U.S. 555, 16 S. Ct. 122 (1895), wrote as follows:

> "The Supreme Court [in Magone v. Wiederer] seems to have adopted the generally accepted rule that chief use in such cases may be shown either by the character of the article itself, as imported, wherein it is evidenced that it is intended and susceptible to but a single use, declared by the statute, or that it may be shown by proof that it is intended and serviceable substantially for the purpose alone declared by the statute within the terms of which it is claimed to be dutiable. That is to say, that it may be brought within the terms of the statute either by evidence manifested by the articles *per se* or given at the trial. That is the accepted doctrine and the one which has received the approval of this court. Richard & Co. v. United States (3 Ct. Cust. Appls. 306; T.D. 32587); United States v. Lyon & Healy (4 Ct. Cust. Appls. 84; T.D. 33366); Athenia Steel & Wire Co. v. United States (1 Ct. Cust. Appls. 494; T.D. 31528)."

The Encyclopaedia Britannica explains that "[a] float, or bobber, is a small buoyant object used to suspend the bait at a given depth, and to act as an indicator that a fish is taking or has taken the bait." *Encyclopaedia Britannica*, Vol. 9, at p. 330 (1963). It also states that a recognized category of sports fishing is "float fishing", and that the equipment necessary to engage in this sport is known as "tackle". Float tackle "consists of the line, the float and the equipment below it in the water." *Ibid.*

There can be but little doubt that "floats" are among the items of tackle intended by Congress to be classified within the purview of item 731.60 of the Tariff Schedules of the United States. Item 731.60, insofar as pertinent to the case at bar, is the successor tariff provision to paragraph 1535 of the Tariff Act of 1930. The language of that paragraph, under which the merchandise in issue was held to be

properly dutiable in the *International Distributors* case, read as follows:

Paragraph 1535, Tariff Act of 1930, as modified by T.D. 53865 and T.D. 53877:

"Artificial baits, and all other fishing tackle and parts thereof (not including fish hooks), fly books, fly boxes, and fishing baskets or creels, finished or unfinished, not specially provided for, except fishing lines, fishing nets and seines"

The merchandise specifically named in paragraph 1535 has been provided for in separate tariff enumerations of the tariff schedules. The remaining language is now the substance of item 731.60 of the tariff schedules, with the addition of clause "[e]quipment designed for sport fishing". The legislative history of item 731.60 of the tariff schedules, as contained in the *Tariff Classification Study*, Schedule 7, pp. 275–6 (United States Tariff Commission, Nov. 15, 1960) shows that the words "equipment designed for sport fishing" were not intended to narrow the scope of the provision for fishing tackle, but rather to broaden it.

The Tariff Commission has used the following language to indicate that fishing floats are classifiable under item 731.60:

"Other fishing tackle (Item 731.60) includes such articles as artificial flies, other artificial baits or lures, weights and sinkers, floats, and gaff hooks." *Summaries of Trade and Tariff Information*, Schedule 7, Vol. 4 (1968); Tariff Commission Publication 231, p. 40.

It is also significant to note that in reporting on articles of cork in item 220.50, the Tariff Commission has stated:

"Other significant cork articles, included in summaries in other volumes, are * * * fishing rod grips (item 731.15), and sports fishing equipment in general (item 731.60)." *Summaries of Trade and Tariff Information*, Schedule 2, Vol. 2 (1968); Tariff Commission Publication 269, p. 139.

Although the last cited publication on the same page also states that item 220.50 covers "* * * *floats for fishing nets*, acoustic tile (for wall and ceiling), life preservers, *balls*, * * *", it is to be noted that item 220.50 covers articles of cork not specially provided for elsewhere. [Emphasis added.] The particular cork balls in issue, limited to those two inches or less in diameter with a center bore $\frac{3}{16}$ inch in diameter, are provided for elsewhere in the provision of the tariff schedules dealing with "[e]quipment designed for sport fishing, fishing tackle, and parts of such equipment and tackle", to wit, item 731.60. See *Stonewall Trading Co.* v. *United States*, 64 Cust. Ct. 482, C.D. 4023, 313 F. Supp. 410, 413 (1970), citing *Wico Corporation* v. *United States*, 60 Cust. Ct. 324, C.D. 3376, 282 F. Supp. 798 (1968), and

*American Astral Corporation* v. *United States*, 62 Cust. Ct. 563, C.D. 3827, 300 F. Supp. 658 (1969).

It is well known that in drafting the Tariff Schedules of the United States, reliance was placed on the *Nomenclature for the Classification of Goods in Customs Tariffs*, popularly known as the *Brussels Nomenclature*. Consequently, this court has repeatedly recognized the Brussels Nomenclature as a source of legislative history. See *W. R. Filbin & Co., Inc.* v. *United States*, 63 Cust. Ct. 200, C.D. 3897, 306 F. Supp. 440 (1969), and cases cited therein. See also *Herbert G. Schwarz, dba Ski Imports* v. *United States*, 57 CCPA 19, C.A.D. 971 (1969).

Section 97.07 of the Brussels Nomenclature provides for:

> "Fish hooks, line fishing rods and tackle; fish landing nets and butterfly nets; decoy 'birds', lark mirrors and similar hunting or shooting requisites."

In pertinent part, the *Explanatory Notes to the Brussels Nomenclature*, Vol. 3, Fourth Impression (1966), states at page 1753:

> "(3) Line fishing rods and tackle * * * Fishing tackle comprises such items as:–reels and reel mountings; artificial bait * * * and hooks mounted with such bait; spinning bait; mounted lines and casts; fishing floats (cork, glass, quill, etc.) including luminous floats; * * *"

In view of the foregoing, it is the determination of the court that the cork balls in issue, chiefly used as floats or bobbers for sport fishing, were intended by Congress to be included within item 731.60 of the tariff schedules, which provides for "[e]quipment designed for sport fishing, fishing tackle, and parts of such equipment and tackle, all the foregoing not specially provided for * * *", at the rate of 25 per centum ad valorem.

Since the controverted material has been shown to be classifiable in item 731.60 of the tariff schedules, the presumption of correctness that attached to the collector's classification has been overcome, and the protest is sustained. Judgment will issue accordingly.