(C.D. 4271)

KOTAKE CO., LTD.
STANDARD TRADING CO., LTD. } *v.* UNITED STATES

---

[9] The distinction between the two methods employed in raising the issue of void liquidations, although not mentioned in the majority opinion in *Cajo*, was emphasized by Judge Rich, who stated in his concurring opinion that protests directed against the refusal to liquidate are not within the jurisdiction of the Customs Court, citing 28 U.S.C. 1583, and that he would dismiss the case as without jurisdictional foundation.

[10] The parties' motions to incorporate the records in three other cases herein are denied as immaterial to resolution of the issue.

United States Customs Court, Third Division

(Decided September 21, 1971)

*Glad & Tuttle (Edward N. Glad* of counsel) ; *Stein & Shostak (Marjorie M. Shostak* of counsel) associate counsel; for the plaintiffs.

*L. Patrick Gray, III,* Assistant Attorney General *(Bernard J. Babb, Ralph Bontempo,* and *Martin L. Rothstein,* trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge; RICHARDSON, J., dissenting

ROSENSTEIN, Judge: The merchandise the subject of the two consolidated protests herein, described on the invoices as cane knives and entered at the port of Honolulu on June 3, 1966 and September 28, 1967,[1] was assessed for duty under TSUS item 650.21 at 1 cent each and 17½ per centum ad valorem as knives with their handles not specially provided for elsewhere. Plaintiffs claimed, in the protests and at the first hearing in Honolulu, on June 18, 1969, that the knives were entitled to entry free of duty under TSUS item 651.39 as agricultural or horticultural hand tools.[2] At a subsequent hearing in New Orleans, on April 7, 1970, plaintiffs moved to amend the protests to include an alternative claim for duty-free entry under TSUS item 648.65, as machetes. Decision on the motion was reserved upon defendant's objection thereto as untimely and prejudicial.

Except for plaintiffs' proposed new claim, this case is a retrial of the issues involved in *Hoffschlaeger Company, Ltd., American Customs Brokerage Co., Inc., et al.* v. *United States,* 60 Cust. Ct. 497, C.D. 3440, 284 F. Supp. 787 (1968), the record of which was incorporated herein. The court held in *Hoffschlaeger* that plaintiffs had failed to establish the chief use [3] of cane knives in the United States.

---

[1] It appears from the official papers that the entries herein were liquidated less than 60 days after the merchandise was appraised, that is, before the appraisements became final. As no appeals for reappraisement were filed and the time therefor has expired, the liquidations remain valid. *John V. Carr & Son, Inc.* v. *United States,* 66 Cust. Ct. 316, C.D. 4209, 326 F.Supp. 973 (1971).

[2] A claim under TSUS item 666.00 was abandoned at the trial and is hereby dismissed.

[3] The court stated (60 Cust. Ct. 501) :
    It is obvious that the provision for "agricultural or horticultural tools" in item 651.39, *supra,* is a designation which enumerates a class of articles in accordance with

The provisions of the Tariff Schedules of the United States pertinent hereto read as follows:

Classified:

Knives not specifically provided for elsewhere in this subpart, and cleavers, with or without their handles:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Knives with their handles:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

  Other:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

650.21    Other_____ 1¢ each + 17.5% ad val.

Claimed:

Hand tools (including table, kitchen, and household implements of the character of hand tools) not specially provided for, and metal parts thereof:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Other hand tools, and parts thereof:
651.39 Agricultural or horticultural tools, and parts thereof_____ Free

We do not set out plaintiffs' alternative claim. To allow the interposition of a new issue, belatedly discovered almost upon the eve of trial in New Orleans, and of proofs pertaining thereto, would be highly prejudicial to defendant which had no opportunity to prepare its case and to adduce testimony on this point some ten months earlier in Hawaii. Furthermore, as the trial judge observed, cross-examination of plaintiffs' witnesses might have been along different lines if earlier notice had been given of the new claim.

Although the government had reserved the right, subject to the court's approval, to retransfer the case to Hawaii, it also had the right, as the learned trial judge commented, "not to go in deeper and deeper with expense, and time, * * *" (R. 36). Defendant, moreover, would be unreasonably exposed to the hazard, oft encountered. in trial prac-

---

their use. Such a designation is subject to the limitations imposed by Rule 10 of the General Headnotes and Rules of Interpretation of the Tariff Schedules of the United States, which reads as follows:

10. General Interpretative Rules.
For the purpose of these schedules—

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

tice, of locating witnesses who might not be available at a future trial date, but who could have been produced, or who were even present, at the earlier hearing.

The motion to amend is denied and the testimonial and documentary evidence of record relating thereto shall be disregarded.

The knives at bar, which are represented by the samples in the incorporated case, have wooden handles and either curved or straight blades, each of which has one sharp cutting edge and a hook on the dull side. The testimony of the witnesses in the incorporated case was summarized by the court as follows (pages 499–500):

Three witnesses testified on behalf of the plaintiffs. The first was Mr. Yasui Chi Hirata, for the last 6 years president and general manager of the plaintiff, Hoffschlaeger Company, Ltd. He testified that the firm, with which he had been associated for 30 years as salesman and warehouseman before becoming president, had imported these knives since February 1965 and distributed them to all the islands of Hawaii. During this period, approximately 10,000 knives had been sold by his company.

Miss June Kemioke, the second witness for the plaintiffs, identified herself as secretary to the president and a director of Standard Trading Company, Inc., an import-export wholesaler that had handled cane knives for several years. Miss Kemioke, an employee of the firm for 12 years, had become familiar with these items by ordering and handling them. She also had seen them at the makers in Japan.

The last witness for the plaintiffs, Charles E. Baker, stated that, for the past 9 months, he has been the manager of the machinery products unit at Amfac, Inc., a sugar factor and wholesaler. Prior to that, he was a mechanical engineer for Theo. H. Davies Company, also a sugar factor and wholesaler. These positions have required Mr. Baker to visit sugar plantations on all the major islands of Hawaii on an average of once a week. In the course of these visits, he has had an opportunity to learn the uses of cane knives on the plantations.

Through the testimony of these witnesses, the following facts were established. Historically, the article in issue, a large knife with a wide blade that has a hook at its end, has been used in Hawaii to harvest sugarcane. When so employed, the blade is used to cut the plant; then the fallen stalk is picked up by means of the hook. However, during the last 20 or 30 years, there has been a change from total hand harvesting to mechanized harvesting, so that cane knives now have been relegated to use in those situations where machines are not practical. The record established that hand labor, at present, is employed only to harvest seed cane and to trim cane growing on rough terrain.

Mr. Baker personally had seen cane knives used only on sugar plantations, but Mr. Hirata and Miss Kemioke testified that they have seen them used also by farmers, homeowners, and landscap-

ing firms to clear brush and shrubbery, and that these witnesses themselves have made such use of them.

Defendant introduced the testimony of four witnesses. The first was Mr. Terry Aratani, an engineer employed by the Highway Division of the Department of Transportation of the State of Hawaii to oversee all the highway maintenance on the Island of Oahu. He testified that his department stocks the knives in issue, which are used on construction projects to clear the line of sight for the survey traverse and on maintenance projects to clear brush and cut shrubs.

Mr. Ernest Freitas, defendant's second witness, identified himself as the supply officer of the Fort Shafter, Hawaii, Area Engineers. As part of his duties, he recently purchased 50 knives represented by plaintiffs' exhibit 2. Twenty-five have been placed on a stand-by basis for use by the fire department in case of brush fire, while the rest are used by the occupants of quarters to cut down stumps and shrubbery. The personnel of the ground section of the fort also are issued cane knives that they use to trim and cut down trees.

Defendant's remaining witnesses, Mrs. Lilly Ihare and Mrs. Ruth Park, employees of department stores in Hawaii, stated that they sell, and have sold for several years, knives such as the samples in evidence. In the course of their duties, they have become familiar with the uses made of these items by their customers. The testimony of both established that purchasers use the cane knives to clear or trim brush, hedges, and trees, or to cut down banana and guava stumps.

In addition to the above testimony regarding the uses of cane knives they have learned through their work, defendant's four witnesses also testified to the uses they have made, or have seen made of these articles. The uses were the same as those enumerated by the witnesses for the plaintiffs, with certain additions. Mrs. Ihare and Mrs. Park also use cane knives to cut wood for their outdoor barbecues, while Mr. Freitas and Mrs. Park use them to cut coconut leaves and tree limbs to the size required for garbage collection.

The court observed that the evidence was limited to Hawaii, which had not been shown to be the principal area of use, and, overruling plaintiffs' claim, concluded (pages 502–503):

&ast; &ast; &ast; the merchandise in issue in the instant case, a knife with a wide blade that has a hook on its end, is not of such an obvious design that only one use is apparent from its appearance. The testimony as to uses in Hawaii, and the impression of the samples themselves, are not sufficient to rule out different uses in other parts of the country. Moreover, since the testimony tended to show that the uses of cane knives have been changing, even in the area covered by the testimony, the court cannot speculate on the likelihood that any one of these uses would prove consistent throughout the United States.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

\* \* \* no evidence was presented to prove that Hawaii is the center of sugarcane production in the United States. Plaintiffs' witnesses, who make no mention of the total volume of cane knives imported into the country, what percentage of these are used in Hawaii, or the uses made of them in other sugarcane producing areas of the United States, do not show that scope of experience necessary to enable us to find that their testimony established the chief use of cane knives in the United States.

In the pending case, plaintiffs called six witnesses and defendant, three witnesses. The testimony of record, in pertinent part, is as follows:

June Kemioke, who had testified in the incorporated case, stated that the Antelope Brand cane knife at bar was similar to incorporated exhibit 3 (curved blade knife), and that she had not observed any uses of cane different from what she had testified to previously.

Torao Wakayama, office manager of the importer, Kotake Co., Ltd., which handles general merchandise such as hardware, groceries and liquor, in addition to cane knives, testified that the knives are sold to jobbers, wholesalers and retailers, and that he has seen them used in the State of Hawaii to cut or trim branches in farms and gardens, and in the fields to make sugarcane seedlings.

Karl Heinz Becker, president and treasurer of a Texas corporation which represents a German firm that exports ropes, chains, cables and hand tools to North America, testified that he has imported cane knives similar to those at bar into the United States since 1963; that, with one exception, his sales of this item were limited to Louisiana, as his efforts (which were not described) to develop sales elsewhere on the mainland were unsuccessful.

Edgar B. Saunders, Jr., sales manager and secretary-treasurer of a New Orleans firm which sells sheet metal and hardware products to lumber yards, hardware stores, heat and air-conditioning people, and sheet and metal shops in Louisiana and from Pascagoula to Jackson, Mississippi, stated that his company sells knives only in the sugarcane growing areas of Louisiana; that it was not successful in selling them to the other areas; that the main use of the knives is to cut sugarcane; and that they are also used to clear grass from ditches.

Edgar B. Saunders, Sr., former manager, now retired, of the hardware division of Woodward White & Company, which sells mostly at wholesale to large industrial customers, contractors and plumbers in Louisiana and the Gulf Coast region of Mississippi, Alabama and northwest Florida, testified that his firm is one of the largest suppliers of cane knives in the South; that for the last 38 years he had guided the sales promotion of these articles; that most of the knives were sold to southern Louisiana sugar mills and to hardware dealers supplying the trade in that area; that the "vast majority"

of knives was used to cut sugarcane; and that a few were used to cut weeds or grass. The witness stated that his company sold approximately 300 dozen cane knives in 1966, of which no more than 15 dozen were sold in New Orleans, and no more than 2 dozen were sold to demolishing companies to clean bricks.

Defendant called Louis A. Velez, Jr., general manager of a New Orleans company engaged solely in building demolition. Velez testified that he was familiar with the cane knives represented by incorporated exhibit 3 as he has been using that type since 1964. He purchased 500 in 1964, 500 in 1965 and 200 in 1966 of these knives from Woodward White and from hardware companies for use by his employees in cleaning bricks. The majority of the knives was purchased in 1964 and 1965 from Woodward White. The witness employed 15 or 20 brick cleaners in 1964 and 1965, and between 7 and 10 in 1966. There are approximately 10 other building demolishing companies in New Orleans, he stated, all of which use cane knives. Velez did not know of a better brick cleaning tool.

Henry Douglas Donovan, owner of a brick company in New Orleans, testified that he used cane knives of the type at bar in his business from 1965 through 1967 to clean brick. His firm purchased approximately 260 knives a year from 1965 through 1967; cleaned between 30,000 and 100,000 bricks per month; and employed from 5 to 20 laborers for that purpose. He bought the knife with the shorter handle as it was easier to use. The "biggest majority" of his cane knives was purchased from Woodward White. The other brick cleaning companies, of which there are approximately 10, also use cane knives. He has observed their use by the other brick firms and by the building demolition companies. His latest purchase of cane knives was in January 1970 from Woodward White. The life of a cane knife in brick cleaning may vary from 2 days to as much as 2 weeks depending upon the hardness of the mortar and if there is concrete on the brick.

Charles Wetsman, owner of a New Orleans hardware store testified that he sold annually approximately three to four dozen cane knives similar to incorporated exhibit 3; that probably 85 to 90 percent were sold to demolishing people and the remainder for use in cutting weeds; that, from 1965 to 1967, he was supplied largely by Woodward White.

Plaintiffs urge that the record herein establishes that the knives at bar are agricultural or horticultural hand tools within the purview of item 651.39.

It is well settled that the district director's official acts are clothed with the presumption of correctness and that he is presumed to have found every fact to exist that is necessary to sustain his classification. *McKesson & Robbins, Inc.* v. *United States,* 27 CCPA 157, C.A.D. 77

(1939). Presumably one of the facts the district director found is that the imported knives were not chiefly used for agricultural or horticultural purposes within the requirements of General Interpretative Rule 10(e) (i).

Unless the chief use of an article is so well known and indisputable that judicial notice may be taken of it, *Tanross Supply Co., Inc.* v. *United States*, 58 CCPA 26 C.A.D. 1000 (1970), chief use is a question of fact which should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation. *W. A. Gleeson* v. *United States*, 58 CCPA 17, C.A.D. 998 (1970); *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953).

In this case, plaintiffs have assumed a particularly onerous burden. For the record discloses, apart from such incidental employment as in clearing brush and grass and in trimming trees, that the cane knives were used mainly for two diverse purposes: cutting cane for seedlings and cleaning brick. Whether or not the knives are better suited to cutting cane, a practice which is on the wane with the increasing mechanization of the sugarcane plantations, they have been successfully adapted by brick and building demolition companies for use in cleaning brick.

Plaintiffs have attempted to remedy the deficiencies of the incorporated *Hoffschlaeger* record by offering evidence as to the use of the knives on sugarcane plantations in Louisiana and their very limited use elsewhere or for other purposes in the continental United States. However, this is offset by the testimony of defendant's witnesses as to a different use, patently neither agricultural nor horticultural, in that same state. In this regard, we are constrained to note that the testimony of the retired division manager of Woodward White & Company, with respect to sales and uses of cane knives, appears, in contrast to that of the government's witnesses, to be based more on recollection of past rather than current uses.

Nor is it clear from this record that Hawaii and Louisiana are, as plaintiffs claim, the only two areas where cane knives are sold and used. Even if this were the case, the two well defined uses of the cane knives are so proximate that, in the absence of more accurate and detailed evidence as to the total quantities imported, and as to the places and manner of use during the relevant time period,[4] we are unable to conclude that plaintiffs have established the chief use in the United States of cane knives and that they have overcome the presumption of correctness attending the classification herein.

---

[4] Incorporated exhibit 4, for example, which purportedly lists the "cane knives *and corn knives* [ ?] sold" by Hoffschlaeger Co., Ltd. in Hawaii from 1965 to March 4, 1967, lumps "plantations, plantation agents, distributors, and wholesalers" together, thus providing an inconclusive picture of the pattern of sales by the company in that state.

The factual situation herein differs substantially from that prevailing, for example, in *Manton Cork Corp.* v. *United States*, 65 Cust. Ct. 241, C.D. 4084 (1970), cited by plaintiffs, wherein the record established that over 90 per cent of certain cork balls were used as fishing tackle and the remainder for various other purposes.

As plaintiffs have failed to meet the requirements of proof of chief use, we do not reach the question whether the knives are agricultural or horticultural hand tools.

The claim for free entry of the instant knives as agricultural or horticultural hand tools is overruled. Judgment will be entered accordingly.

### DISSENTING OPINION

RICHARDSON, Judge: I dissent from the majority in these protests because the liquidation was not based on a "final appraisement."

According to a footnote in the majority opinion the official papers in these protests indicate the entries were liquidated within 60 days after appraisement, but since no appeal for reappraisement has been filed and the time therefor has expired, the majority considers the liquidations valid under the case of *John V. Carr & Son, Inc.* v. *United States*, 66 Cust. Ct. 316, C.D. 4209, 326 F. Supp. 973 (1971).

These are 1966 and 1968 protests, and, according to Title I, Section 122 of The Customs Courts Act of 1970, and Rule 14.9(b)(1) of the Rules of the Customs Court, they are governed by the law in effect prior to October 1, 1970. The liquidations in these protests are premature and void. The law in effect prior to October 1, 1970 as declared by the Court of Customs and Patent Appeals, and by this court in an unbroken chain of decisions, is that a liquidation of an entry prior to the expiration of the 60 days after appraisement in which the collector or district director might appeal for reappraisement is not upon a "final appraised value", is premature and void, and a protest against such liquidation must be dismissed as premature. *United States* v. *Boston Paper Board Co.*, 23 CCPA 372, T.D. 48233 (1936). See also: *Lawrence Groom & Co.* v. *United States*, 64 Treas. Dec. 119, T.D. 46559 (1933), *Biddle Purchasing Co., et al.* v. *United States*, 69 Treas. Dec. 880, T.D. 48320 (1936), *Ti Hang Lung & Co.* v. *United States*, 3 Cust. Ct. 268, C.D. 248 (1939), and *The New Home Sewing Machine Co.* v. *United States*, 62 Cust. Ct. 895, R.D. 11655 (1969). There can be no "final appraised value" until either the right of appeal has been exhausted, or the statute of limitations has run against such appeal. Only then can there be a legal liquidation.

The Second Division in the case of *John V. Carr & Son, Inc.* v. *United States*, C.D. 4209 (April 29, 1971), takes the position that the Court of Customs and Patent Appeals, and this court, prior to April 29,

1971, in using the word "void" to characterize a liquidation made prior to the expiration of the 60 days allowed for an appeal for reappraisement didn't really mean "void" but meant "voidable"; that it is legally wrong for the district director to liquidate prior to the expiration of the 60 days within which he may appeal, but his illegal act is merely "voidable," and the blemish of illegality in not waiting for a "final appraisement" before liquidating is automatically wiped off by the expiration of the 60 days without the district director filing an appeal for reappraisement.

The opinion in the *Carr* case, *supra*, relies upon 19 U.S.C.A., § 1501 (a) (section 501(a) of the Tariff Act of 1930) in attempting to establish a "final appraised value." That statute provides in the part relied upon as follows:

"(a) * * * The decision of the appraiser, including all determinations entering into the same, shall be final and conclusive upon all parties unless a written appeal for a reappraisement is filed with or mailed to the United States Customs Court by the collector within sixty days after the date of the appraiser's report, or filed by the consignee or his agent with the collector within thirty days after the date of personal delivery, or if mailed the date of mailing of written notice of appraisement to the consignee, his agent, or his attorney. Every such appeal shall be transmitted with the entry and the accompanying papers by the collector to the United States Customs Court."

19 U.S.C.A., § 1501 would be pertinent here, if plaintiffs were parties seeking an *appeal for a reappraisement*—an action against an appraising officer for his determination of an "appraised value." This is not such an action. This is a protest proceeding—an action against a collecting officer for his liquidation on a basis other than a "final appraised value," involved in 19 U.S.C.A., § 1503—one of the three essential elements the collecting officer is required to use in liquidating an entry, whether or not there has been an appeal for a reappraisement. The other two elements are quantity and rate. He cannot liquidate until the appraisement has become a "final appraised value," and he has determined the other two elements (quantity and rate) entering into his liquidation.

The opinion in the *Carr* case, *supra*, does not cite any cases holding that a collector or district director may make a premature liquidation in contravention of the statute, 19 U.S.C.A., § 1503 (section 503 of the Tariff Act of 1930), as amended, which provides:

"(a) Except as provided in section 1562 of this title (relating to withdrawal from manipulating warehouses), the basis for the assessment of duties on imported merchandise subject to ad valorem rates of duty shall be the *final appraised value*." (Emphasis added.)

It has been judicially determined that an appraised value becomes final upon the expiration of a 60-day period absent the filing of an appeal for reappraisement, and that the collecting officer cannot liquidate until the appraisement has become a "final appraised value."

The premature liquidation was not an act which the collector or district director had the power to perform, but performed in an improper manner as the Court of Customs and Patent Appeals held the facts to be in the case of *Joseph Fischer* v. *United States*, 38 CCPA 143, 150, C.A.D. 452 (1951), cited in the *Carr* case. The collector or district director had no power to liquidate until there was a "final appraisement," that is, after the 60 days for appeal had expired. Even that case made a distinction between what is merely "erroneous" and thus "voidable" and what is "illegal" and thus "void."

Whereas the opinion in the *Carr* case, *supra*, does not expressly state that the district director may waive the 60 day period within which he may appeal, the opinion implies as much.

The argument that the collector or district director be regarded as having waived his right to appeal by a premature liquidation was exploded in *Lawrence Groom & Co.* v. *United States*, 64 Treas. Dec. 119, T.D. 46559 (1933), where the collector liquidated an entry eleven days after the appraiser's report and thereafter filed an appeal for reappraisement on the fifty-ninth day. The court in permitting him to appeal for reappraisement did not regard the premature liquidation as a waiver of his right to appeal. The court at page 121 said:

> "* * * The collector in this case had no appraised value upon which he could *legally* assess duty until after the 60-day period after the appraiser's return, within which he was authorized to file an appeal for a reappraisement, had expired." (Emphasis added.)
>
> &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;
>
> "It is not within the power of the collector to destroy the authority granted him by Congress of filing an appeal for a reappraisement by liquidating an entry during the time within which he is authorized to file an appeal for a reappraisement of the merchandise. *The collector cannot destroy a legal right by the doing of an illegal act.*" (Emphasis added.)

A waiver means to irrevocably relinquish a right that is beneficial to the individual. A person cannot make a waiver of a right and then later say "I have changed my mind. I take the waiver back." The 60-day period within which the collector or district director may appeal is not a personal right or privilege to waive, but a right given the collector or district director on behalf of the United States Government to determine within a 60-day period whether in the public interest an appeal for reappraisement should be taken. He cannot shorten this 60-day period by a premature liquidation.

The *Lawrence Groom & Co.* case, *supra*, was decided on the basis of section 503 of the Tariff Act of 1922 which did not contain the expression "final appraised value." The court did use substantially similar language in its decision when it said: "In this case the appraised value of the merchandise did not become *final* and conclusive upon all parties so long as the right of appeal was vested in either of them." (Emphasis added.)

The expression "final appraised value" appeared for the first time in section 503 of the Tariff Act of 1930. Section 503 was amended in 1953, but Congress retained the expression "final appraised value," with a knowledge of the court's interpretation of the expression. If Congress had disapproved of the long standing judicial interpretation of what is meant by "final appraised value," it is submitted that it would have further amended the statute to indicate its disapproval. Its failure to do so evinces an intent to consider premature liquidations null, void and of no effect.

In the *Biddle Purchasing Co., et al.* case, *supra*, the majority of the court also rejected the contention that a liquidation prior to the expiration of the 60-day period constitutes a waiver of the 60-day waiting period for the appraisement to become final.

The Second Division, in its opinion in the *Carr* case, *supra*, states that in the *Biddle* case, *supra*, "* * * where no appeal was filed, the appraisement was not held void." The issue in the *Biddle* case, *supra*, was not whether the appraisement was void, but whether the liquidation was void. The court had the following to say on this issue, at pages 885 and 886 of its opinion:

> "It was only after sixty days from the date of the appraiser's report that the appraised value became final. Any liquidation made prior to the time when the appraisement becomes final is *void and without any force or effect. Such has been the holding of this court and the appellate court.*" (Emphasis added.)

> "* * * on March 23, 1936, in *United States* v. *Boston Paper Board Co.*, 23 CCPA 372, T.D. 48233, [the Court of Customs and Patent Appeals did] hold that the attempted liquidation of the entry prior to the expiration of the time within which to appeal for reappraisement was properly held by the trial court and the division to be *null and void.*

> "On the facts in the case at bar we so hold." (Emphasis added.)
>     At page 885.
>
> \*          \*          \*          \*          \*          \*          \*
>
> "* * * The date on which final appraisement became valid was provided for under existing law. Therefore the liquidation in question, having been made prior to the time allowed by law, viz, sixty days, when the apraisement became final, and during which period the collector had the right to appeal, was invalid.

*"We therefore hold the liquidation of the entries covered by these protests null and void, and of no force and effect.* The protests are sustained." (Emphasis added.)
    At pages 885–886.

The headnote in the *Biddle* case, *supra,* at page 880 also states:

"A liquidation made prior to the expiration of the sixty days allowed by law to the collector within which to appeal for reappraisement is *void,* as the appraisement by the appraiser does not become final and conclusive until such time has expired." (Emphasis added.)

Admittedly a headnote is no part of the decision in a case, but in this instance it does succinctly and accurately capsule the opinion.

The Customs Courts Act of 1970, effective October 1, 1970, changes the administrative procedure in appraisement and liquidation, but the same Act limits this court to applying the law in effect prior to October 1, 1970, in deciding protests, the trial of which began prior to October 1, 1970 (Title I, Section 122 of The Customs Courts Act of 1970). Also, Rule 14.9(b)(1) of the Rules of the Customs Court effective October 1, 1970, provides:

"All actions in which trials have commenced prior to October 1, 1970 shall be further processed and governed in accordance with the law and with the rules of the court in effect prior to October 1, 1970."

These protests were tried prior to October 1, 1970.

The liquidations herein are null and void by reason of their prematurity, and the protests filed herein against such void liquidations are premature, and must, therefore, be dismissed.